UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PETITION OF PANDORA MEDIA, INC. | Civil Action No. 12-8035 (DLC) (MHD) |
| *Related to* | |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | **ECF CASE** |
| AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, | Civil Action No. 41-1395 (DLC) (MHD) |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
THAT ASCAP PUBLISHER "WITHDRAWALS" DURING THE TERM OF
PANDORA'S CONSENT DECREE LICENSE DO NOT AFFECT
THE SCOPE OF THE ASCAP REPERTORY SUBJECT TO THAT LICENSE**

## TABLE OF CONTENTS

I.     INTRODUCTION...................................................................................................... 1

II.    FACTUAL BACKGROUND ................................................................................... 5

   A.   THE ASCAP CONSENT DECREE ........................................................................ 5

   B.   PANDORA'S LICENSE HISTORY WITH ASCAP ................................................. 6

   C.   EMI'S "WITHDRAWAL" AND ASCAP'S MAY 2011 COMPENDIUM CHANGE ................. 7

   D.   EMI'S "WITHDRAWAL" AND THE EMI – PANDORA LICENSE ......................... 9

   E.   THE ASCAP-RMLC AGREEMENT ................................................................... 10

   F.   THE SONY "WITHDRAWAL," THE DERAILED PANDORA-ASCAP SETTLEMENT AND THE

        SONY – PANDORA AGREEMENT ....................................................................... 11

   G.   ASCAP'S DECEMBER 2012 COMPENDIUM CHANGE ...................................... 13

   H.   BMG'S, UMPG'S, WARNER'S, AND OTHERS' IMPENDING WITHDRAWALS ................. 14

III.   ARGUMENT ........................................................................................................... 15

   A.   LEGAL STANDARD ............................................................................................ 15

   B.   ASCAP SHOULD NOT BE PERMITTED TO UNILATERALLY NARROW THE SCOPE OF

        PANDORA'S CONSENT DECREE LICENSE DURING ITS TERM OF EFFECT ..................... 16

   C.   UNLESS PANDORA'S CONSENT DECREE LICENSE IS RECOGNIZED AS A "LICENSE-IN-

        EFFECT," PANDORA WILL BE DEPRIVED OF OTHER AFJ2 PROTECTIONS ................... 19

IV.    CONCLUSION ....................................................................................................... 25

Petitioner Pandora Media, Inc. ("Pandora") submits this memorandum of law in support of its motion for an order granting summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure against the American Society of Composers, Authors & Publishers ("ASCAP") that any ASCAP publisher "withdrawals" under Rule 1.12 of the Compendium of ASCAP Rules and Regulations, and Policies Supplemental to the Articles of Association (the "Compendium") during the term of Pandora's license pursuant to Section IX of the Second Amended Final Judgment[1] ("AFJ2") do not affect the scope of the ASCAP repertory subject to Pandora's blanket license—which took effect on January 1, 2011, and runs through December 31, 2015—for which this Court must set a reasonable fee.

## I.    <u>INTRODUCTION</u>

*"I think this litigation is to some extent driven by the creation within ASCAP of a new media and technology department in 1995." Judge Cote, MobiTV Tr. 196:22-23.*

As this Court is aware from the MobiTV – ASCAP litigation in which it made the above observation, ASCAP for many years has sought to create an arbitrary and discriminatory pricing structure for so-called "new media" licensees pertaining to their distribution of programming substantially similar to traditional television and radio programming via internet, mobile, or other non-traditional means. Unable to convince the Court and the Second Circuit to endorse such *per se* discrimination, ASCAP and its publisher members resorted to new tactics in April 2011 when they modified ASCAP's Compendium to establish an unprecedented form of membership.

On their face, ASCAP's new membership rules purport to permit publishers to "withdraw" their catalogs from ASCAP on a selective and limited basis, freeing the publishers to become the exclusive licensors of their repertories—but only with respect to a limited subset of

---

[1] *United States v. Am. Soc'y of Composers, Authors & Publishers*, C.A. No. 41-CV-1395, 2001 WL 1589999 (S.D.N.Y. June 11, 2001) ["AFJ2"].

"New Media Transmissions" made by an even more limited subset of ill-defined "New Media Services." ASCAP and its "withdrawing" publishers have taken the position that such "withdrawals" act (and will act) to dramatically reduce the size of the repertory covered by the license secured by Pandora's October 2010 written request pursuant to Section IX of AFJ2 (the "Consent Decree License"), even though Pandora's Consent Decree License took effect well before any new-media publisher "withdrawals" arguably occurred.

At this moment, EMI Music Publishing ("EMI") and Sony/ATV Music Publishing ("Sony") already have "withdrawn" "New Media Transmission" licensing rights from ASCAP. And each of Universal Music Publishing Group ("UMPG"), Warner-Chappell Music Publishing ("Warner"), and BMG/Chrysalis ("BMG")—executives of which, like Sony/ATV-EMI, all serve on ASCAP's Board—have announced their "withdrawals" of "New Media Transmission" license rights as of July 1, 2013. If these "withdrawals" are applied to Pandora's Consent Decree License, well more than half of ASCAP's repertory—all of which was indisputably available to Pandora at the time of its Consent Decree License application and effective date—will no longer be licensable to Pandora by ASCAP but, as discussed below, will be available to the vast majority of Pandora's competitors.

As elaborated upon below, ASCAP's and its publishers' efforts to eviscerate the scope of Pandora's Consent Decree License during its term can neither be reconciled with the express language of AFJ2 nor with ASCAP's own Compendium rule changes, which make clear that these new-media "withdrawals" do not apply for the duration of any "Licenses-In-Effect" in existence as of the effective date of the "withdrawals." Indeed, ASCAP's "withdrawal" mechanism as implemented effectively is a sham; no publisher actually either has withdrawn from ASCAP or has withdrawn its works from the ASCAP repertory. Rather, "withdrawing"

publishers remain in ASCAP for every other purpose, including serving on ASCAP's board, negotiating collectively where it serves their purposes (*i.e.*, for the vast majority of ASCAP's collective licensing activities), and controlling the formulas for royalty collection and distribution.[2] Further, "withdrawing" ASCAP publishers can reverse their "withdrawal" from ASCAP at any time. Rather than facilitating competition via direct licensing, ASCAP's "withdrawal" mechanism renders "withdrawing" publishers stalking horses that are impervious to any competitive risk in the marketplace: if the "withdrawing" publisher secures a higher rate from a licensee, ASCAP will tout the rate as a benchmark for the rest of its repertory—as this Court has already heard ASCAP's counsel proclaim in prior court conferences; if it fails, the "withdrawn" publisher seamlessly can return to ASCAP's safety net and avoid receiving a lower rate in a free market negotiation with licensees.[3]

ASCAP, moreover, has limited the applicability of these "withdrawals" in a manner that plainly discriminates against Pandora compared to its webcasting competitors. Pandora operates the most-listened-to non-interactive internet radio service. Pandora's largest competitors are operated by entities covered by the ASCAP – Radio Music License Committee ("RMLC") agreement achieved after years of litigation and approved by this Court in January 2012 (months after the new rule changes were adopted and the first publisher "withdrawal" thereunder occurred); yet ASCAP has explicitly insulated entities engaged in New Media Transmissions that

[2] According to the Compendium, "ASCAP's royalty distributions are made in accordance with the rules and formulas adopted by the Board of Directors." Wetzel Decl., Ex. T, Rule 3.1.1.

[3] The collective motive of ASCAP's publisher members and their respective PROs, ASCAP and BMI, is transparent: to selectively evade Rate Court oversight and effectuate price increases. As BMI CEO Del Bryant said of BMI's similar "withdrawal" phenomenon: "In the case of withdrawal, [publishers] believe they may obtain higher royalty rates from this market if they negotiate their own agreements outside of BMI's regulatory framework. . . . We are working diligently to make that value a reality not just for large multinational music companies, but for ALL songwriters, ALL composers and ALL music publishers. We have already cited these marketplace agreements in our negotiations with our licensees and we will encourage our Rate Court to consider them as a new indicator of market value." Wetzel Decl., Ex. B.

are affiliated with RMLC licensees from the effects of any "withdrawals."[4]

Conversely, by enacting a further compendium rule change in December 2012 in order to create a class of so-called "Standard Services," ASCAP has reserved the right to treat similarly situated music users that meet some undefined criteria differently, under a form license that includes the repertoires of "withdrawing" publishers, but only provided such services are willing to accept ASCAP's form license lock, stock, and barrel, at a price dictated by ASCAP. In other words, if a service qualifies as a "Standard Service" it must forego its AFJ2 right to seek reasonable fees as determined by this Court or face negotiating with "withdrawing" publishers.

Regardless of whether AFJ2 allows the fracturing of the ASCAP repertory wrought by these Compendium rule changes (an issue the Court need **not** reach on this motion), it surely does not permit ASCAP and its publisher members to decimate the repertory subject to Pandora's Consent Decree License while the parties and the Court determine a reasonable fee therefor. As detailed below, any other holding would vitiate Pandora's AFJ2 Section VI right to a license to "all of the works in the ASCAP repertory," as well as its "right," while Section IX proceedings are pending, to "perform any, some or all of the works in the ASCAP repertory to which [Pandora's AFJ2 license] application pertains." AFJ2 Section IX.E. Indeed, as the

---

[4] The implications of ASCAP's and its member publishers' conduct which, unless stopped, would impose an entirely discriminatory licensing structure on Pandora, are so grave to Pandora that Pandora has purchased (as will be announced publicly today) a commercial radio station—KXMZ—subject to the RMLC – ASCAP Agreement. Kennedy Decl. ¶ 15. This entitles Pandora—as "an entity that owns one or more commercial radio stations"—to make "Radio Group Transmissions" under the RMLC – ASCAP "2010 Radio Group License Agreement" that is part and parcel of the RMLC – ASCAP Agreement. *See* Wetzel Decl., Ex. C. Pandora has submitted to ASCAP its Group License providing for coverage of the New Media Transmissions made on Pandora's internet radio service effective June 5, 2013. Kennedy Decl. ¶ 15; *id.* Ex. F. If ASCAP honors the express terms of the RMLC – ASCAP Agreement and stipulates that Pandora is licensed for all its New Media Transmissions from the effective date of Pandora's purchase of KXMZ until the end of the RMLC – ASCAP Agreement (December 31, 2016), that would simply require this court to establish a reasonable rate for Pandora for the period January 1, 2011 through June 5, 2013. If ASCAP disputes Pandora's entitlement to the RMLC – ASCAP license (including for New Media Transmissions made on the Pandora service), Pandora will move for summary judgment determining that Pandora is so entitled based on the express terms of the RMLC – ASCAP Agreement and the indisputable fact of Pandora's ownership of a commercial radio station.

purported ASCAP "withdrawals" mount and the scope of works ASCAP would purport to license to Pandora dwindles to an increasingly smaller minority of ASCAP's actual repertory (for all other purposes), any other result also would effectively deprive Pandora of any meaningful rate-setting determination by this Court in connection with the license it applied for—and as the ASCAP repertory existed—as of January 1, 2011.

For these reasons, summary judgment should be awarded determining that the publisher "withdrawals" do not affect the scope of the repertory licensed pursuant to Pandora's Consent Decree License, which has an effective term of January 1, 2011 through December 31, 2015.

II.     **FACTUAL BACKGROUND**

A.  **The ASCAP Consent Decree**

As the Court is well aware, ASCAP operates under a consent decree stemming from an enforcement action brought by the Antitrust Division of the United States Department of Justice ("DOJ"). *See generally* AFJ2. At the heart of DOJ's enforcement action was the recognition that concerted action among publishers posed (and continues to pose) grave competitive concerns and that ASCAP, while offering certain procompetitive benefits, nevertheless must be constrained in how it facilitates interactions among its member competitors. The AFJ2 constraints most centrally implicated in this case are as follows:[5]

*Availability of a blanket Consent Decree License covering all works in the ASCAP repertory upon written request.* Section VI of AFJ2 requires ASCAP, upon written request, to grant music users a non-exclusive license to perform "**all of the works in the ASCAP repertory**." Moreover, while a reasonable fee for a requested license is being determined, "the

---

[5] It is noteworthy that AFJ2 Section III  provides that AFJ2 "appl[ies] to ASCAP . . . and to each of its officers, directors . . . and to all other persons in active concert or participation with them." As noted herein, executives of Sony, EMI, Warner/Chappell, UMPG and BMG all serve as ASCAP directors.

music user shall have the right to perform **any, some or all of the works in the ASCAP repertory to which its application pertains** . . . ." AFJ2 § IX.E. Further, ASCAP may not "assert[] or exercis[e] any right or power to restrict from public performance by any licensee of ASCAP any work in order to exact additional consideration for the performance thereof." AFJ2 § IV.F. And ASCAP may "not grant to any music user a license to perform one or more specified works in the ASCAP repertory unless" the music user requests such a license. AFJ2 § VI.

      *Prohibition against discrimination.* Section IV.C of AFJ2 prohibits ASCAP from "discriminat[ing] in license fees or other terms and conditions between licensees similarly situated." And Section IX.G provides that, when a reasonable fee has been determined by the rate court, "ASCAP shall be required to offer a license at a comparable fee to all other similarly situated music users who shall thereafter request a license of ASCAP." AFJ2's applicability is not conditioned upon the means of transmission of a music user's programming. *See, e.g.*, AFJ2 §§ II.F-H; *see also Am. Soc'y of Composers, Authors & Publishers v. MobiTV, Inc.*, 681 F.3d 76 (2d Cir. 2012) (affirming the Court's application of long-standing cable television rates to mobile and internet television service). *United States v. Am. Soc'y of Composers, Authors & Publishers,* 627 F.3d 64, 82-83 (2d Cir. 2010) (rejecting lower court's application of unitary, higher rate for internet distribution when lower, long-standing rates for similar content were available).

      *Judicial enforcement.* Section IX.A of AFJ2 requires ASCAP to advise Pandora of "the fee that it deems reasonable **for the license requested**." If the parties cannot reach agreement, then either ASCAP or the music user may apply to the rate court for determination of a reasonable fee for the requested license.

### B.  Pandora's License History with ASCAP

      Pandora entered into its first license with ASCAP on July 11, 2005, when it accepted the

ASCAP Experimental License Agreement for Internet Sites and Services – Release 5.0. Kennedy Decl. ¶ 8; *id.*, Ex. A. By 2010, Pandora had determined that the rate structure thereunder, which called for royalties calculated as the greater of 1.85% of the licensee's revenue or $0.0006 per "Session," was unreasonable. *Id.* ¶¶ 8-9. On October 28, 2010, Pandora sent a letter to ASCAP terminating Pandora's existing license with ASCAP effective December 31, 2010, and requesting a license for Pandora's services effective January 1, 2011, through December 31, 2015, pursuant to Section IX of AFJ2 (as noted, Pandora's "Consent Decree License"). Wetzel Decl., Ex. D.

### C. EMI's "Withdrawal" and ASCAP's May 2011 Compendium Change

ASCAP's rules historically allowed for members to withdraw their entire catalogs from ASCAP (*e.g.*, withdraw from ASCAP so the member became the sole licensor of the copyrighted works for all purposes).[6] *See* Wetzel Decl., Ex. F, Rule 1.11. In fact, on or before September 30, 2010, EMI notified ASCAP of its intent to resign its membership in ASCAP—*i.e.*, to withdraw its catalog from ASCAP's repertory for all purposes—effective April 1, 2011. Wetzel Decl., Ex. G. During the time between EMI's notice and the effective date of its complete resignation from ASCAP membership, ASCAP launched what it dubbed the "Internet Initiative" that would create a mechanism for new-media-only "withdrawals." *Id.*, Ex. AF.[7]

On or about March 25, 2011, ASCAP notified the Department of Justice ("DOJ") that it had "engaged in discussions with EMI to determine the terms under which EMI could reserve

---

[6] This right of withdrawal is enshrined in AFJ2 and is intended to facilitate competition between ASCAP and BMI for songwriter members.

[7] The Court will notice the extensive redactions to ASCAP's board minutes. While Pandora has not yet received a privilege log asserting the bases for ASCAP's redactions (which include redactions of presentations by non-attorneys to the board), it reserves its right to compel production of non-privileged information in ASCAP's board minutes.

exclusively to itself the right to license particular on-line users." *Id.*, Exs. J-K. ASCAP acknowledged that AFJ2 did not expressly authorize its contemplated rule changes and offered that "the antitrust laws do not appear to bar ASCAP from agreeing to such a proposal." *See id.* Later that week, EMI's Roger Faxon sent a letter to ASCAP's John LoFrumento seeking to postpone the date of its resignation to May 1, 2011. *Id.*, Ex. G.

At its April 27, 2011 meeting, the ASCAP board of directors voted to adopt the rule changes proposed pursuant to its "Internet Initiative." *Id.*, Ex. I. The following day, EMI and ASCAP entered into an agreement permitting EMI to "substitute" its notices of resignation from membership with notices of new-media "withdrawal" so that EMI would not have to wait to effectuate its new-media "withdrawal." *Id.*, Ex. G.

Newly adopted Compendium Rule 1.12.1 provided that:

> Any ASCAP Member may modify the grant of rights made to ASCAP under such Member's Membership Agreement by withdrawing from ASCAP the right to license the right of public performance of certain "New Media Transmissions" . . . of works . . . in which the Member has an interest and any corresponding interests of Writer Member(s) and/or Publisher Member(s) in such works that such ASCAP Member has the right to withdraw . . . .

*Id.*, Ex. A. The withdrawals under Rule 1.12 thus are limited to "New Media Transmissions," which are defined in Rule 1.12.9 as including digital audio transmissions for which a music user must comply with the license requirements of 17 U.S.C. §§ 114, 115, and/or 106(1). *Id.* The Compendium goes on to describe a "New Media Service" as any standalone offering by which a "New Media Transmission of musical compositions is made available or accessible (i) exclusively by means of the Internet, a wireless mobile telecommunications network, and/or a computer network and (ii) to the public, whether or not, in exchange for a subscription fee, other fee or charge is made . . . ." *Id.*

ASCAP's "Internet Initiative" not only targets a limited set of licensees—indeed, one "withdrawing" publisher referred to it internally as the "ASCAP/Pandora withdrawal," *see* Wetzel Decl., Ex. L—but any "withdrawals" pursuant thereto are immediately reversible at the discretion of the publisher. Under Rule 1.12.6, "any Member may terminate its Membership Modification at any time upon written notice to ASCAP, and thereby grant back to ASCAP the rights previously withdrawn." *Id.*, Ex. A.

Notably, however, any "withdrawal" under Rule 1.12 is subject to any "Licenses-In-Effect on the Effective Date of the Membership Modification." *Id.* Rule 1.12.5. Rule 1.11.1 defines "Licenses-In-Effect" as "any rights or obligations existing between ASCAP and its licensees **under then-existing licenses**." *Id.* (emphasis added). There is no differentiation in the Compendium as to long-form licenses voluntarily entered into between ASCAP and a licensee and a license that is granted pursuant to a licensee availing itself of a license under AFJ2.

### D.  EMI's "Withdrawal" and the EMI – Pandora License

Despite ongoing negotiations between ASCAP and Pandora in the months after EMI's notice of resignation, ASCAP made no mention of EMI's intention to withdraw and gave no indication of its brewing "Internet Initiative." *See*, *e.g.*, *id.*, Exs. R, M; *see also* Kennedy Decl. ¶ 10. Indeed, ASCAP sent Pandora a proposed interim fee agreement on April 20, 2011, confirming the scope of Pandora's effective license under AFJ2 as "authorizing nondramatic public performances of any of the copyrighted musical works in the ASCAP repertory." *Id.*, Ex. M.

Pandora learned of EMI's "withdrawal" along with the rest of the public in May 2011. *See* Kennedy Decl. ¶ 10. In response to questions about the effect of ASCAP's rule change and EMI's "withdrawal" on Pandora's pending negotiations with ASCAP, ASCAP informed Pandora

of its position that it could not grant Pandora a license covering EMI compositions for the period

beginning May 1, 2011. *Id.* Not wanting to risk an infringement suit and the potential for

massive damages, Pandora began negotiating separately with EMI. *See id.* In November 2011,

while Pandora engaged in negotiations with EMI, Sony (as part of a larger bidding consortium)

won a bid to purchase EMI's catalog. *See* Wetzel Decl., Ex. Y. Pandora completed a license with

EMI in March 2012, at a rate equivalent to EMI's pro-rata share of a negotiated percentage of

Pandora's revenues.[8] *See* Kennedy Decl. ¶ 10; *id.*, Ex. B.

The Federal Trade Commission (FTC) permitted the Sony – EMI transaction to proceed

in June 2012. *See* Wetzel Decl., Exs. Z-AA.

### E.  The ASCAP-RMLC Agreement

In January 2012, this Court approved an industry-wide settlement between the RMLC

and ASCAP covering the license period January 1, 2010, through December 31, 2016 (the

"ASCAP – RMLC Agreement"). *See In re The Cromwell Group, Inc.*, C.A. No. 1:10-CV-5210,

Final Order (S.D.N.Y. Jan. 30, 2012) ("RMLC Order"); *see also* Wetzel Decl., Ex. C.[9] The

ASCAP – RMLC Agreement expressly covers New Media Transmissions made by entities

affiliated with RMLC licensees at a rate of 1.7% of revenue attributable to those transmissions,

with a standard deduction (from revenue) of 25% to cover costs of advertising sales. *Id.* at

ASCAP-PAN 00030322-23. The ASCAP – RMLC Agreement expressly indicates that it "is

---

[8] Unbeknownst to Pandora, EMI entered into an agreement with ASCAP by which ASCAP would administer EMI's 2012 license with Pandora, *see* Wetzel Decl., Ex. AE, notwithstanding that the EMI license with Pandora specifies that *EMI* will process Pandora's performance data to identify sound recordings for which EMI owns or controls some or all of the underlying musical works. *See* Kennedy Decl., Ex. B.

[9] Later in 2012, the RMLC and BMI reached a substantially identical agreement covering the same time period. *See* Wetzel Decl., Ex. AB.

applicable to Clear Channel's iHeartRadio transmissions that do not originate with a terrestrial radio station."[10] *Id.* at ASCAP-PAN 00030331.

Notwithstanding EMI's prior April 2011 "withdrawal," the ASCAP – RMLC Agreement also includes a representation and warranty that "**there has been no material diminution of the ASCAP Repertory since January 1, 2010**; and . . . if any ASCAP Member . . . has withdrawn from ASCAP the right to license the right of public performance of New Media Transmissions . . . or withdraws such rights during the License Term, such withdrawal of licensing rights from ASCAP has not precluded, and will not preclude, ASCAP from granting a through-to-the-audience license to perform **any or all of the copyrighted musical works in the ASCAP repertory** of that ASCAP Member to the RMLC stations pursuant to this Agreement for the duration of the License Term." *Id.* at ASCAP-PAN 00030332 (emphasis added).

### F.  The Sony "Withdrawal," the Derailed Pandora-ASCAP Settlement and the Sony – Pandora Agreement

On September 15, **2011**, Sony informed ASCAP of its intention to "withdraw" new-media licensing rights from ASCAP effective April 1, 2012. *See, e.g.*, Wetzel Decl., Exs. O.1-3. On March 14, 2012, less than one month before the purported effective date of Sony's initially noticed "withdrawal," Sony wrote to ASCAP requesting to postpone its "withdrawal" until December 31, 2012. *Id.*, Ex. P.1-5. Pandora, however, did not learn of Sony's impending withdrawal until September 28, 2012—more than a year after ASCAP knew[11]—when a blog

---

[10] iHeartRadio is considered one of Pandora's principal competitors. Kennedy Decl. ¶ 11. Indeed, based on the latest Triton Top 20 Internet Radio Services list, at least 16 of the 19 non-Pandora entities appearing on the list are licensed under the ASCAP – RMLC agreement. Kennedy Decl. ¶ 11; *id.*, Ex. C.

[11] Curiously, when counsel for Pandora inquired in November 2011 about whether "any ASCAP members other than EMI [had] withdrawn digital rights authorization from ASCAP," ASCAP's Richard Reimer cryptically responded, "No other ASCAP member has withdrawn digital rights authorization from ASCAP effective as of now." Wetzel Decl., Ex. U. Pandora's counsel replied seeking clarification but the record reflects no response. *Id.*

post suggested that Sony planned to withdraw from ASCAP effective January 1, 2013.[12]
Kennedy Decl. ¶ 12; *id.*, Ex. D.

 With these developments, Pandora began to negotiate with both ASCAP and Sony
separately.[13] On November 1, 2012, counsel for Pandora emailed Sony requesting electronic
copies of Sony's and EMI's "withdrawn" works, noting that "given the uncertainties around
Sony/ATV's and EMI's position with respect to webcasting rates, "Pandora had decided that it
needs to be prepared to take down all Sony/ATV and EMI content in the event we are unable to
agree on rates by the end of this year." Costin Decl. ¶ 2; *id.*, Ex. A. Sony informed Pandora that
ASCAP, not Sony, possessed the information Pandora requested and could provide it to Pandora.
*Id.* ¶ 3. Pandora thus was prevented at that time from identifying and taking down any songs for
which it might not have a license come January 1, 2013.

 Meanwhile, in late November 2012, in an effort to settle this proceeding, Pandora and
ASCAP reached an agreement in principle on license terms for Pandora, as summarized in a term
sheet exchanged between the parties. *See* Wetzel Decl., Ex. AH. Notwithstanding that ASCAP's
management had agreed to terms with Pandora, at ASCAP's December 13, 2012 board meeting,
it was decided that "Management will reject Pandora's offer as inadequate." *See id.*, Ex. AE.

 Upon being advised by ASCAP that the Pandora – ASCAP agreement had not been
approved and ASCAP's representation that it would be unable to license Sony's catalog as of
January 1, 2013, on December 17, 2012, Pandora General Counsel Delida Costin, in an email to
Sony, reiterated Pandora's request for information regarding Sony's "withdrawn" works because

---

[12] ASCAP waited until November 2012 to send a memorandum to its members announcing the Sony/ATV/EMI
"withdrawal" effective January 1, 2013. Wetzel Decl., Ex. X.

[13] Given Sony/EMI's estimated combined market share of approximately 30%, Pandora felt compelled to begin
negotiations with Sony. Kennedy Decl. ¶ 12; *id.*, Ex. E.

"Pandora must prepare for the possibility that we are unable to obtain a license prior to January 1, 2013." Costin Decl. ¶ 4; *id.*, Ex. B. That same day, Pandora outside counsel made a similar request to ASCAP. Wetzel Decl., Ex. AG. Again, Pandora received nothing. *See* Costin Decl. ¶ 5; Kennedy Decl. ¶ 13.[14]

Consequently, and to avoid any risk of potentially crushing copyright infringement exposure come January 1st absent a deal being signed, Pandora reluctantly accepted a deal with Sony with a much higher rate than that secured for the entire ASCAP repertory by the RMLC one year before, or from EMI by Pandora while the FTC was mid-review of the Sony – EMI transaction. *See* Kennedy Decl. ¶ 14. And, despite a strict confidentiality provision in the Sony – Pandora deal, news reports disclosing the amount of Sony's rate hike quickly circulated featuring quotes from Sony's CEO, an ASCAP Board member, about the increase in rates from Pandora. *See* Wetzel Decl., Ex. V.

### G.  ASCAP's December 2012 Compendium Change

At the same December 2012 ASCAP board meeting referenced above, ASCAP further amended its Compendium to permit an even further nuanced "withdrawal." Wetzel Decl., Ex. AE. Apparently in order to minimize the administrative burden that an actual withdrawal of new media rights would undoubtedly entail, this amendment purports to allow publisher members to "withdraw" their New Media Transmission Licensing Rights "in whole or in part" by

---

[14] Pandora had no effective way of discovering—and ASCAP and Sony made it as difficult as possible to ascertain—which works are in fact subject to these new-media "withdrawals." Such conduct violates Sections X.A and X.B of AFJ2, which require ASCAP to identify with specificity the works that are included in the ASCAP repertory and thus subject to ASCAP's AFJ2 Section VI requirement to grant a blanket license. The purpose of this requirement was hammered home by the DOJ in its Memorandum in Support of Modification of AFJ2: "This information enables users to make more informed licensing decisions and can facilitate substitution of music from one PRO for music from another or direct licensing from rights holders." Wetzel Decl., Ex. AK at 38. This stonewalling on ASCAP's/Sony's part placed Pandora in the untenable position of effectively having to accede to exorbitant license fee demands or risk facing claims of copyright infringement.

establishing a subset of New Media Services called "Standard Services." Under the revised new

Rules:

> The Member submitting a Membership Modification must indicate in its
> submission whether the withdrawal of its grant of rights is in whole or in
> part. If in part, the Member's New Media Transmission Licensing Rights
> will continue to be licensed and administered by ASCAP for only those
> "New Media Services" (defined in 1.12.9 below) that: (i) qualify for and
> are licensed by way of any of ASCAP's form new media license
> agreements, or (ii) qualify for and are licensed by an ASCAP "affiliate" or
> "multi-site" license agreement (collectively, "Standard Services").

*Id.*, Ex. T, Rule 1.12.2(b). This most recent enactment allows ASCAP publishers to avoid

dealing with smaller licensees who elect to accept an ASCAP form license at a price dictated by

ASCAP, while precluding ASCAP from licensing their works to New Media Services who either

do not qualify as "Standard Services" or who choose to avail themselves of their AFJ2 right to

obtain a reasonable fee rather than accept the terms of ASCAP's form licenses. *See id.*, Ex. T.

### H. BMG's, UMPG's, Warner's, and Others' Impending Withdrawals

Contemporaneous with the ASCAP board meeting at which the ASCAP – Pandora

settlement failed to receive approval, UMPG, BMG, and Warner—the executives of which all sit

on ASCAP's Board—each gave ASCAP notice of their intention to "withdraw" as of July 1,

2013. *See* Wetzel Decl., Ex. W. According to a posting on ASCAP's website in March 2013,

Kobalt Music Publishing and Ruminating Music have given "revocable" notice of their intent to

withdraw effective October 1, 2013.[15] *Id.*

---

[15] Another, small publisher, Sea Gayle Music, is listed with an effective withdrawal date of January 1, 2014.
However, Sea Gayle's Executive Vice President and General Manager Marc Driskill confirmed that Sea Gayle
initially had given notice to keep open its option of withdrawing, with the idea that it would only actually withdraw
if ASCAP could not establish satisfactory New Media rates. *See* Wetzel Decl., Ex. AI.

III.   **ARGUMENT**

    **A. Legal Standard**

Like contracts, "decrees are generally to be interpreted consistently with their 'plain meaning' or 'explicit language.'" *United States v. Am. Soc'y of Composers, Authors & Publishers*, 782 F. Supp. 778, 787 (S.D.N.Y. 1991) ("*Turner*"). "[T]he scope of the decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984). "[W]ords and phrases . . . should be given their plain meaning." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005).

"If the language utilized has only one reasonable interpretation, . . . then the court must look exclusively to the language found in the decree." *Turner*, 782 F. Supp. at 788 (citations omitted). "If, however, the wording is susceptible to more than one reasonable construction, then the court must look to extrinsic evidence, as is the case with ambiguous contracts." *Id.* (citations omitted). "Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1975). "The reference in *ITT* to 'the circumstances surrounding the formation of the consent order' encompasses not only traditional parol evidence—that is, the representations made by the negotiators to each other in the course of negotiations . . . —but also any meaningful indicia of the purpose, if any, of the contested provision." *Turner*, 782 F. Supp. at 788 (citations omitted).

Where decree language is unambiguous or "if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary,"

interpretation as a matter of law and summary judgment is appropriate. *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157-58 (2d Cir. 2000). "Similarly, if there is *no* extrinsic evidence bearing on the parties' intentions, the proper interpretation of ambiguous contract language is an issue for the court." *Malmsteen v. Universal Music Group, Inc.*, No. 10 Civ. 3955(PAE), 2013 WL 1694402, at *6 (S.D.N.Y. Apr. 19, 2013) (citations omitted).

### B.  ASCAP Should Not Be Permitted To Unilaterally Narrow the Scope of Pandora's Consent Decree License During Its Term of Effect

AFJ2 Section IX.A requires ASCAP to issue a license "to any, some or **all** of the works in the ASCAP repertory." And Section IX.E provides that, "[p]ending the completion of any . . . negotiations or proceedings" regarding the reasonable fee for a license requested pursuant to Section IX.A, "the music user shall have the right to perform any, some or **all of the works in the ASCAP repertory to which its application pertains** . . . ." AFJ2 thus licenses music users requesting a blanket license pursuant to Section IX.A to publicly perform any and all works in the ASCAP repertory while the parties, with or without the Court's assistance, arrive at a reasonable fee for the license requested.[16]

The language of AFJ2 could not be clearer. There is no dispute that Pandora requested and received a Consent Decree License to all of the works in the ASCAP repertory effective January 1, 2011—before any "withdrawals" became effective. Wetzel Decl., Ex. D. All that remained at that juncture was for the parties, or perhaps the Court, to determine a reasonable fee

---

[16] As the Second Circuit described in *United States v. Am. Soc'y of Composers, Authors & Publishers*, 331 F.2d 117, 124 (2d Cir. 1964), "Section VI . . . says . . . that ASCAP must place itself in a position where, without the members' assent, it can grant the request of any applicant who wants the whole ASCAP repertory but that it may not grant a license for particular compositions without the member's request or notice to him." The Compendium changes would turn things upside down. Rather than support the tenet that ASCAP must be in a position to grant a blanket license to the "whole ASCAP repertory" without needing to obtain members' assent individually, ASCAP is now opening itself up to a drastic splintering of "the whole ASCAP repertory."

for that Consent Decree License. ASCAP and its members have no right to materially diminish the scope of the catalog covered by Pandora's Consent Decree License while the parties and the Court are in the process of "negotiations or proceedings" to determine reasonable fees.

Ironically, had Pandora and ASCAP agreed upon a reasonable final fee for Pandora's Consent Decree License prior to EMI's withdrawal in April 2011, it appears that ASCAP would not argue that EMI's or any subsequent publishers' "withdrawals" would have any effect on Pandora until after the conclusion of Pandora's Consent Decree License term at the end of 2015. Wetzel Decl. Ex. G at ASCAP-PAN 00033453. No different result is warranted merely because Pandora availed itself of its AFJ2 right to have the Court set a reasonable fee for its license.

ASCAP's Compendium itself recognizes the need to avoid "pulling the rug out from under" an existing licensee in connection with a publisher's withdrawal. Over and again the Compendium renders any publisher withdrawal "subject to Licenses-In-Effect." *See, e.g.*, Wetzel Decl. Ex. T, Rule 1.12.2(c)(i) and (ii); Rule 1.12.5 (providing that ASCAP will continue to have the right to license New Media Transmissions post "withdrawal" "for the duration of such Licenses-In-Effect"). The term "License-In-Effect" is defined in Compendium Rule 1.11.1 simply as "rights or obligations existing between ASCAP and its licensees under then-existing licenses." *Id.* This definition does not delineate between licensees under negotiated final fee licenses or Consent Decree Licenses—nor should it, since all such categories of ASCAP licensees are equally "licensed" to perform "all of the works in the ASCAP repertory," whether pursuant to a final agreement or pursuant to Section IX.E.

The plain meaning of the term "license" is well established: "'The word 'license' means permission, or authority, and a license to do any particular thing, is a permission or authority to do that thing; and if granted by a person having power to grant it, transfers to the grantee the

right to do whatever it purports to authorize.'" *Gibbons v. Ogden*, 22 U.S. 1, 213 (1824). Plainly, Pandora's Consent Decree License, effective January 1, 2011, secured via Pandora's October 2010 application under AFJ2 Section IX, fits that bill.

ASCAP's present attempt to eviscerate Pandora's Consent Decree License also flies in the face of ASCAP CEO John LoFrumento's initial announcement to ASCAP's staff in May 2011 about the scope of EMI's withdrawal, wherein he explained: "[a]ny digital music users that ASCAP has already licensed will remain licensed by ASCAP for the term of those licenses." Wetzel Decl., Ex. AJ. There is no mention in Mr. LoFrumento's explanation as to—nor does logic support—how a Consent Decree License is any less entitled to treatment as a License-in-Effect than any other form of ASCAP license. ASCAP's history with the RMLC—whereby it expressly exempted RMLC Licensees from EMI's prior "withdrawal" that took effect during the RMLC's Consent Decree License term, but before final fees were set by this Court's RMLC Order in January 2012—also demonstrates the appropriateness of treating Pandora's Consent Decree License as a License-In-Effect.

Pandora relied on its ability to negotiate with ASCAP in good faith regarding a reasonable fee for its Consent Decree License, subject to having this Court set a reasonable fee in the event the parties could not agree. *See* Kennedy Decl. ¶¶ 8-9. It had absolutely no notice of ASCAP's impending rule changes and EMI's impending withdrawal in April 2011. *Id.* ¶ 10. Just as it would be inequitable to permit a material diminution in ASCAP's repertory during the term of a negotiated license, it would be unfair and counter to the pro-competitive principles underlying AFJ2 to leave Pandora in the lurch by drastically diminishing ASCAP's ability to license Pandora during the course of Pandora's Consent Decree License. Furthermore, it would establish a precedent allowing publishers to penalize prospective ASCAP licensees that seek to

avail themselves of this Court's oversight of ASCAP rates, making judicial oversight of ASCAP's rate-setting practices illusory. In contrast, if ASCAP's anticipated position prevails, Pandora will have spent years of negotiation and litigation over a license that promises to be an undefined shadow of its former self (relative to when Pandora's Consent Decree License became effective) by the time the Court sets a reasonable fee for that license herein.

### C.  Unless Pandora's Consent Decree License Is Recognized as a "License-In-Effect," Pandora Will Be Deprived of Other AFJ2 Protections

As a further matter of decree interpretation, "if the defendant did not bargain for unambiguous language precluding the competing interpretation, the court is not limited in what data it may look to in discerning the proper meaning of the decree, and in particular may look to equitable considerations that flow from the statute underlying the decree and the fact that, in this respect, the decree is a court order as well as a contract." *Turner*, 782 F. Supp. at 788 (citations omitted). Where decree language is ambiguous and future conduct is at issue, "a court of equity may, in construing the provision, consider the purpose of the provision in the overall context of the judgment at the time the judgment was entered." *United States v. Am. Cyanamid Co.*, 719 F.2d 558, 564 (2d Cir. 1983); *see also Am. Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 570 (2d Cir. 1990) (noting that the "context" of 1950 Decree reflects intent to "disinfect" ASCAP "as a potential combination in restraint of trade").

There is no credible argument that AFJ2 (or its predecessors) unambiguously authorized or, as of 2001, even contemplated the part-in, part-out form of ASCAP membership created by ASCAP's Compendium Rule changes in 2011. ASCAP's March 25, 2011 submission to the Department of Justice makes this point emphatically clear. *See* Wetzel Decl., Exs. J, K. Thus, in addition to considering whether ASCAP's "withdrawal" mechanism violates the express terms of

AFJ2, the Court should consider the overall context underlying AFJ2's (and its predecessors') entry in determining whether AFJ2 permits ASCAP's attempt to allow publishers to "withdraw" the majority of compositions in ASCAP's repertory from the scope of Pandora's Consent Decree License while that license is in place and proceedings to determine a reasonable rate are ongoing.[17] In addition to AFJ2 Section IX's express pronouncement regarding the scope of Pandora's Consent Decree License as including "any, some or all of the works in the ASCAP repertory to which [Pandora's] application pertains," *see* AFJ2 § IX.E, treating that license as anything other than a License-In-Effect for purposes of the recent publisher "withdrawals" cannot be squared with other protections and the overall purpose of AFJ2.

### 1. To Permit the "Withdrawals" To Affect Pandora's Consent Decree License Would Allow ASCAP To Evade AFJ2's Requirement that ASCAP License Its Entire Repertory upon Request

Section VI of AFJ2 states that "ASCAP is hereby ordered and directed to grant to any music user making a written request therefor a non-exclusive license to perform **all of the works in the ASCAP repertory** . . . ." (emphasis added). In fact, all of the works purportedly "withdrawn" pursuant to Compendium Rule 1.12 **remain** in the ASCAP repertory for nearly every licensee licensed by ASCAP—except Pandora. ASCAP's description of the Compendium Rule changes explains, as regards the New Media Transmission rights ostensibly "withdrawn," that "ASCAP will continue to license and distribute royalties for all other public performance

---

[17] As the DOJ noted in its memorandum supporting the entry of AFJ2, "[i]t should be emphasized, therefore, that the United States' support of the AFJ2 is not intended to, and should not be construed as, approving practices not expressly prohibited, immunizing ASCAP from further antitrust remedies or suggesting that legislative action is not warranted." Wetzel Decl., Ex. S, at 1.

rights, including performances on radio, television, cable, live performances, and all New Media

services not affected by the withdrawal of rights." Wetzel Decl., Ex. X.[18]

AFJ2's definitions of "ASCAP repertory" and "ASCAP music" are instructive here. The

definitions are articulated in terms of "works" or "compositions"—**not** in terms of a right to

license public performances parceled on a licensee-by-licensee or medium-by-medium basis.[19]

*See* AFJ2 § II.C; *see also* AFJ2 § II.B ("'ASCAP music' means any **work** in the ASCAP

repertory."). ASCAP cannot dispute that the "withdrawn" works are still "works the right of

public performance of which ASCAP has or hereafter shall have the right to license" and thus

meet the express definition of "ASCAP repertory" in the consent decree. AFJ2 § II.C.

ASCAP's representations and warranties in the ASCAP – RMLC agreement are

consistent with such a reading. They specify that "there has been no material diminution in the

ASCAP Repertory since January 1, 2010," which could not be true if EMI's works had been

withdrawn from the ASCAP repertory in April 2011. *See* Wetzel Decl., Ex. C at ASCAP-PAN

00030332. And ASCAP assures the RMLC that, "if any ASCAP Member . . . has withdrawn

from ASCAP **the right to license the right** of public performance of New Media

Transmissions . . . or withdraws **such rights** during the License Term, such withdrawal of

**licensing rights** from ASCAP has not precluded, and will not preclude, ASCAP from granting a

through-to-the-audience license to perform any or all of the **copyrighted musical works in the**

**ASCAP repertory** of that ASCAP Member." *Id.* (emphasis added). This language suggests that

---

[18] This is consistent with Compendium Rule 1.12.2(c)(ii), which provides for ASCAP to continue to collect and pay royalties for otherwise "withdrawn" works "in respect of . . . public performing rights licenses for non-New Media Transmissions [for] which ASCAP collects royalties." Wetzel Decl., Ex. T.

[19] Even ASCAP's Canadian counterpart, SOCAN, referred to ASCAP's new membership structure as entailing "the **purported** withdrawal of certain rights for specified uses" in confirming that ASCAP's "withdrawals" do not apply to SOCAN writer members. Wetzel Decl., Ex. AL (emphasis added).

ASCAP understands that, under AFJ2, a composition cannot be "in" and "out" of the ASCAP repertory at the same time.

ASCAP's presumed position that the defined term "ASCAP repertory" could somehow have fundamentally different meanings depending on the identity of the music user (or the owner of the music user), and subject to ASCAP's and its members' whims, is also inconsistent with the canons of interpretation providing that agreements should be construed consistently, *see, e.g.*, *In re Bay Harbour*, 56 Fed. App'x 21, 23 (2d Cir. 2003), and that an agreement's terms should be given consistent effect. *See, e.g.*, *Orient Overseas Container Line Ltd. v. Crystal Cove Seafood Corp.*, C.A. No. 10-CV-3166, 2012 WL 468927, at *12 (S.D.N.Y. Feb. 14, 2012).

Moreover, the unilateral establishment of a new-media sub-repertory while a rate is being set for Pandora's Consent Decree license is inconsistent with the provision in Section VI specifying that "ASCAP shall not grant to any music user a license to perform one or more **specified** works in the ASCAP repertory unless" the music user requests such a license. AFJ2 § VI. As Pandora has not requested such a license from ASCAP, that is precisely what the result would be with respect to the dwindling sub-repertory which would remain licensable to Pandora from ASCAP if the "withdrawals" at issue are permitted.[20]

As discussed above, Pandora's October 2010 license request sought a blanket license under AFJ2 "authorizing nondramatic public performances of any of the copyrighted musical

---

[20] Allowing ASCAP to effectuate these "withdrawals" also would be inconsistent with AFJ2 § IV.F, which provides that "ASCAP may not "assert[] or exercis[e] any right or power to restrict from public performance by any licensee of ASCAP any work in order to exact additional consideration for the performance thereof." ASCAP's invention and implementation of new-media "withdrawals" during the term of Pandora's Consent Decree License unilaterally has restricted Pandora's access to public performance rights for works under circumstances that necessarily enable "withdrawing" publishers to "exact additional consideration" for the performance of works within their catalogs. This effect is compounded by the lack of transparency with which the rule-change and "withdrawal" process has been implemented.

works **in the ASCAP repertory**." Wetzel Decl., Ex. D; *see also* AFJ2 § II.E (defining "Blanket

License" as "a non-exclusive license that authorizes a music user to perform **ASCAP music** . . .

."). There is no dispute that Pandora's Consent Decree License pursuant to that request licensed

all the works in the ASCAP repertory (including the EMI and Sony works ostensibly withdrawn

**after** that date) when it took effect on January 1, 2011. Given that Sony's, EMI's, and other

withdrawing publishers' works remain in the "ASCAP repertory" even after their so-called

"withdrawals," Section VI of AFJ2 requires ASCAP to grant Pandora the license it requested—

*i.e.*, covering "all of the works in the ASCAP repertory."[21]

Whether to accept ASCAP's re-interpretation of AFJ2's "all works" language to mean

whatever bundle of rights a member chooses to grant to ASCAP for its works must be evaluated

in the context of the interpretation's overall impact on AFJ2, and not just in the context of this

Compendium amendment. In other words, if it is permissible to define "ASCAP repertory" on

the basis of varying subsets of public performance "rights," carved up as each member saw fit,

this interpretation would be available to justify any effort to circumvent the requirements of the

decree, including this Court's jurisdiction to determine reasonable rates. The Standard Services

form license is a dramatic example of how the Compendium amendments can effectively coerce

users to take an unreasonably priced blanket license from ASCAP without having any

meaningful recourse to this Court.

---

[21] The provisions of Section VI requiring ASCAP to license its entire repertory exist for good reason: they ensure that ASCAP's blanket license retains its pro-competitive benefits of efficiency, while offsetting the substantial aggregation of market power inherent in the aggregation of individual works that do not compete against each other on the basis of price. *See, e.g.*, *BMI v. CBS*, 441 U.S. at 20-22. These requirements work hand in glove with the non-exclusivity provision of AFJ2 (Section IV.A) and the prohibition against interfering with individual member direct licensing (Section IV.B) to ensure that music users will have a genuine choice between ASCAP blanket licenses, other ASCAP license forms, and individual publisher direct licenses.

As another example, suppose a member were to "withdraw" from ASCAP the "right" to license its works as to particular links in the chain of television transmissions (*i.e.*, so-called "through-to-the-audience" licensing). Based on its position to date in this proceeding, we would expect ASCAP to argue that its failure to grant a through-to-the-audience license covering all of the works in its repertory would not violate AFJ2, because it would be granting a license to the fullest extent that it had the right to do so, subject to its member publishers' ability to limit the scope of rights granted to licensees; yet such conduct plainly would eviscerate AFJ2's through-to-the-audience license mandate.[22]

### 2. Permitting the "Withdrawals" To Affect Pandora's Consent Decree License Conflicts with AFJ2's Grant of Rate-Setting Jurisdiction to this Court in this Proceeding

Permitting the new-media "withdrawals" to apply to Pandora's Consent Decree License would conflict with AFJ2's express grant of jurisdiction to this Court to set a reasonable fee for the license requested by Pandora. For example, even on the limited discovery record available, it is evident that the new-media "withdrawals" as implemented conflict with the anti-discrimination provisions of AFJ2. Section IV.C of AFJ2 prohibits ASCAP from "discriminat[ing] in license fees or other terms and conditions between licensees similarly situated." Even assuming that ASCAP has any right to allow for partial "withdrawals" within AFJ2's framework, the scope of the works in ASCAP's Blanket License—*i.e.*, whether it includes the works of "withdrawing" publishers comprising more than half of ASCAP's repertory—is a very important "other term" to a licensee. Further, Section IX.G provides that, when a reasonable fee has been determined by the rate court (as was the case for the RMLC –

---

[22] If there is a legitimate reason to permit ASCAP members to withhold certain public performance "rights" from ASCAP licensing authority, the way to accomplish that end is through modification of AFJ2—with the attendant public comment and public interest standard review process—and not the self-help effort that ASCAP and its members have undertaken for the express purpose of avoiding this Court's oversight.

ASCAP deal approved by this Court in January 2012), "ASCAP shall be required to offer a license at a comparable fee to all other similarly situated music users who shall thereafter request a license of ASCAP."

We know already that ASCAP's "withdrawal" mechanism indisputably discriminates between services engaged in New Media Transmissions that are owned by entities covered by the ASCAP – RMLC agreement, services licensed by ASCAP as "Standard Services" under Compendium Rule 1.12.2(b), and Pandora. The question in this proceeding—for the Court to determine, not ASCAP—is whether AFJ2 prohibits ASCAP from engaging in such discrimination with respect to Pandora. By seeking to implement substantial rule changes applicable only to certain licensees (including Pandora) during the term of Pandora's Consent Decree License, and by taking a position that those changes apply to pending rate setting negotiations / proceedings **while** Pandora's Consent Decree License is in effect, ASCAP effectively prejudges the similarly situated inquiry required by AFJ2 in usurpation of this Court's jurisdiction and without giving Pandora an opportunity to present its case before the "withdrawals" occur.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should enter an order determining that any ASCAP publisher "withdrawals" of New Media Transmission rights purportedly made after the effective date of Pandora's Consent Decree License do not affect the scope of ASCAP's repertory licensed thereunder.

DATED: June 11, 2013                    Respectfully submitted,

                                        KING & SPALDING LLP

Kenneth L. Steinthal (KS-7897)
Joseph R. Wetzel (JW-0510)
101 Second Street, Suite 2300
San Francisco, CA  94105
Telephone:     415.318.1200
Facsimile:     415.318.1300

*Attorneys for Pandora Media, Inc.*