D98TPANA

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------------x

3  IN RE PETITION OF PANDORA MEDIA, INC.     12 CV 8035 (DLC)

4  ------------------------------------x

5  Related to

6  UNITED STATES OF AMERICA,

7              Plaintiff,

8         v.                              41 CV 1395 (DLC)

9  AMERICAN SOCIETY OF COMPOSERS,
   AUTHORS AND PUBLISHERS,
10
              Defendant.
11
   ------------------------------------x
12                                    New York, N.Y.
                                      September 11, 2013
13                                    2:30 p.m.

14 Before:

15                 HON. DENISE L. COTE,

16                                     District Judge

17                       APPEARANCES

18 KING & SPALDING
        Attorneys for Petitioner Pandora Media, Inc.
19 BY:  KENNETH L. STEINTHAL
        JOSEPH R. WETZEL
20      JEFFREY S. SEDDON

21 PAUL, WEISS, RIFKIND, WHARTON & GARRISON
        Attorneys for Defendant ASCAP
22 BY:  JAY COHEN
        DARREN W. JOHNSON
23      LYNN B. BAYARD

24

25

D98TPANA

1          (In open court, case called)

2          THE COURT:  I have a motion for summary judgment, and

3    I indeed have a draft opinion.  And you probably know it's not

4    my practice generally to have oral argument unless I need it.

5    I actually am not quite sure that I have confusion about how to

6    come out on the motion, but my concern is that I may not fully

7    understand the context in which this motion is being made.

8          We have a trial coming up in December.  As I analyze

9    it, the particular issues presented to me are sort of driven by

10   the unambiguous and clear language of AFJ2.  So out of an

11   abundance of caution that I want to make sure that I analyzed

12   things with as much care as I would like to and am giving you

13   the guidance you need as you prepare for trial and otherwise

14   organize your lives, I sent out an order September 5th

15   identifying seven questions I wanted counsel to be prepared to

16   address.  I think some of them reflect my confusion about why

17   there is any confusion, since certain terms are confined in

18   AFJ2.

19          And the result of the way I analyze AFJ2 in the

20   context of this motion could be a fairly far-reaching one, more

21   far reaching than is really requested by anyone.  So as a

22   result, I invited argument.  I want you to feel free to address

23   anything that you think would be helpful for me to hear, even

24   if it doesn't relate specifically to the seven questions I

25   posed, and I, of course, will feel free to ask you questions

D98TPANA

1    even if they're beyond the seven listed in the September 5th

2    order.

3              Since it's Mr. Steinthal's motion, I suppose we should

4    start with Mr. Steinthal, but I think we'll go back and forth

5    until we have exhausted what I think is helpful to me at least.

6              Mr. Steinthal.

7              MR. STEINTHAL:  Thank you, your Honor.

8              Your comments were right at the top of the list of

9    what I was going to address, which is I'm quite mindful of the

10   limited relief that we have requested upon behalf of Pandora.

11   By the petition and by this motion, we invoked your

12   jurisdiction over a proceeding which relates exclusively to

13   Pandora and to scope of rights available under the consent

14   decree license that Pandora has requested.

15             So at that level, the relief we're seeking is very

16   limited to us.  I'm equally mindful that in order to resolve

17   the issues we have raised, there may be broader implications to

18   others.  There may be broader implications down the road.  But

19   to be very clear, we brought this proceeding because Pandora

20   needed to have a determination of the scope and rate for the

21   license it requested.  It made its license request in late 2010

22   for a consent decree license under Article 9 for the term

23   1/1/11 through 12/31/15.  And that is the jurisdiction we have

24   invoked, and the relief we requested is specific to Pandora.

25             And that license now, obviously, your Honor, ASCAP's

D98TPANA

1    position, which is that it has been permitted to, in my view,

2    eviscerate the scope of the license, and to come to question

3    seven at some point, why it's so important to have this

4    determination now, so we know what we're going to trial about.

5    Because we need to know whether it's all the works in the

6    repertoire at the time that we applied for the license, or is

7    it what is left after not only withdrawals that we have seen so

8    far, but also their scheduled withdrawals on October 1,

9    scheduled withdrawals on January 1, can it be that ASCAP can be

10   permitted to basically end up giving us just what is left,

11   which could be less than 20 percent of its repertoire by the

12   time we get to trial or shortly thereafter?

13          Those are issues that I clearly was going to raise

14   anyway, that goes question seven, but I think your Honor's

15   comments dovetail what I was going to say at the beginning,

16   which is I can't worry about the fact that your Honor's

17   resolution of our issues may have broader implications.  If

18   they do, they do.  But in terms of the jurisdiction we invoked

19   when we came here, we came here on behalf of Pandora for a

20   blanket license request, and we need to determine what the

21   scope of our license is and what a reasonable rate is for it.

22          THE COURT:  Well, your statement -- and you put a lot

23   of emphasis on January 1st, 2011 in your papers.  Your

24   statement right now is that whatever existed, the works in the

25   repertoire as of January 1st, 2011 and the rights for the

D98TPANA

public performance of those works, has to be what you obtained

for the five-year period.  But that's really true, because you

expect ASCAP to hopefully acquire new works.  You hope that

composers will keep composing and that those works will be

added to the ASCAP repertoire.  And you hope that your

five-year license will give you the right to publicly perform

those new works.  And similarly, if a work was withdrawn from

the ASCAP repertoire during the period of the five-year

license, I don't see you making an argument that you would

continue to have a license to publicly perform at that work if

it were withdrawn in the middle of the five-year license.

MR. STEINTHAL:  I address that in the context of your

questions, but I agree with a hundred percent.  It keys, your

Honor, on the definition of a work.  A work may be -- a writer

may leave ASCAP at a given point in time and take works from

ASCAP to BMI and vice versa.

The issue here is ASCAP's interpretation of its decree

to permit it to, within the context of a single work, retain it

in its repertoire for purposes of everybody else, but not to

license that work to Pandora and a scant few others.  That's

the problem.  The problem isn't -- we're not trying to argue,

your Honor, that works are frozen in time, but the reality is,

and I think your questions go right to the point, maybe I

should dive right into the questions, answer them with the

authority that I hope your Honor has already found and getting

D98TPANA

1    to the point where you've gotten.  But to be very clear, I

2    fully understand that if you agree with us as to the proper

3    interpretation of what an ASCAP work is and what the ASCAP

4    repertoire is under the ASCAP consent degree, it may be that

5    this form of publisher withdrawal that permits ASCAP ostensibly

6    to license some users with those works but not others with

7    those works, it may very well be that the implication of all

8    that is that these publisher withdrawals can't withstand

9    analysis under the consent decree.

10          Our petition was focused on our circumstances.  So

11   that as you'll see when I do the argument here, the position

12   under Section 6, and you asked that question under Section 6 of

13   the decree, that's the provision that it's an absolute

14   mandatory obligation on the part of ASCAP to license all works

15   in its repertoire upon request.  So if you find that the

16   repertoire consists of works -- not of rights, but of works,

17   then I think for sure our view is these publisher withdrawals

18   are problematic under Section 6.  But under Section 9 we come

19   to you with a specific rate court request, and under Article 9

20   we have again requested a blanket license to cover all the

21   works in the ASCAP repertoire effective with our application

22   date.  That's the reason I focus on January 1, 2011.

23          Clearly when we talk about the purposes of the decree,

24   one of the purposes of the decree and one of the central

25   provisions of the decree is your Honor's jurisdiction to

D98TPANA

oversee ASCAP's licensing and to set rate determinations when

agreed users can't reach an agreement.  How can it be that we

have unequivocally -- when we made the request, we had a

license to all the works in the ASCAP repertoire.  Not even

ASCAP argues that effective January 1, 2011, the EMI works or

the Sony works or the Universal works, whatever, they were all

part of the repertoire as of that date.

        The implication of ASCAP's position is that we can

effectively deprive you of the Article 9 right that you have

for a rate setting to the works in the ASCAP repertoire when we

applied.  That's a more limited argument, your Honor, than

whether all of these publisher withdrawals can't be sustainable

under the decree.  I could argue the latter point, and I think

the implications of our arguments are that there are very, very

serious problems under Article 6 with this form of partial

withdrawal.

        If you want to me to address those, I will deal it in

the context of the questions that you raised, but I want to

make it clear we had an exchange of correspondence about what

in the case was about and wasn't about in the context of

counsel for some of the publishers.  Our view is very, very

straightforward to your Honor.  We're here because we have a

specific petition pending.  But the implications of our

arguments, to the extent they have implications broader than

our circumstances, they are what they are.

D98TPANA

1              THE COURT:  Well, I understand that you intend to

2      honor your direct licenses with publishers such as EMI, and you

3      do not want to be heard to be in anticipatory breach of them or

4      anything like that.  But I don't understand how I can respond

5      to your motion for summary judgment here without addressing the

6      larger issues.  I don't think I can just confine myself to a

7      January 1, 2011 analysis.  I think any construction of the

8      terms of AFJ2 necessarily requires me to work through what each

9      of the definitions mean, what rights must be granted and were

10     granted by license effective January 1, 2011, and let the chips

11     fall where they may with respect to the outcome of that.

12              Let me ask you then, and this sort of focuses on

13     question seven.  At the trial in December I'm going to be

14     deciding a rate.  An appropriate rate for what?  I'm not going

15     to be deciding, I think, an appropriate rate for one point in

16     time, January 1, 2011.  I'm going to, I assume -- and I'm very

17     anxious for counsel to address this, but I'm going to be

18     deciding a rate perhaps as of January 1st, 2011 but for a

19     five-year license for an understanding of the value of a

20     five-year license as of January 1st, 2011.  So aren't I going

21     to have to value a rate?  Is it for just a one-day point in

22     time a five-year license rate?

23              MR. STEINTHAL:  No, your Honor.  That's why I think

24     it's so imperative that you make this ruling now and define for

25     us what is in the repertoire and what's not.  ASCAP's view

D98TPANA

seems to be that they can indeterminately have a repertoire the

size of X or X minus A or X minus B or X minus A, B and C and

it doesn't matter, we don't have to know before we get to trial

what we're valuing.  Your Honor, that's particularly

problematic.  Let's assume -- we know who has made ostensible

withdrawals, and if you add up the scope of the repertoire to

EMI and Sony and Universal and Warner/Chappell and BMG, you get

to the point where you're way blowing way past half and closer

to three-quarters of the repertoire.

        Now it is impossible in my view, your Honor, going to

trial not knowing what the repertoire is that we're trying to

set fees for.  If we're left with -- and I hate to use this

kind of pejorative word, but let's say the scraps, let's say

all the good stuff has been pulled out, if their position is --

        THE COURT:  Why don't we say the big publisher stuff

has been pulled out.

        MR. STEINTHAL:  OK.  There's been no showing -- we

need to know -- they're going to make a showing that what is

left is of equal value and equal quality to what had been

pulled out.  We have never had a proceeding like this, your

Honor.  In the *DMX* case you were very careful when you were

looking at a portion of the repertoire as a potential benchmark

to evaluate the quantity of those works.  Were they

representative of the rest of the works in the repertoire?

        In my view, this case is about all the works in the

D98TPANA

1   repertoire, and the publisher withdrawals should be ineffectual

2   at least as to Pandora which applied for the license at a time

3   before any of the withdrawals took place.  So I have a lot of

4   views about the phrase "at the relevant time," but one of my

5   views is the relevant time, if it matters at all, was when we

6   made the application, and you can't pull out the rug out from

7   under our license after we made our consent decree application.

8          So my view is we go to trial and evaluate the entirety

9   of the license, because that's the entirety of the repertoire

10  at the time we made our application.  ASCAP's view is this is a

11  moving target.  By the time we get to trial, your Honor, who

12  knows what's going to be there?

13         I need to know as a litigator, for example, and you

14  need to know as the rate setter:  Do we have an issue here over

15  whether what is left in the ASCAP repertoire is representative

16  of the content that's been pulled out?  Maybe all the good

17  stuff has been pulled out.  That has profound implications on

18  what the value of the rest is.  We need to know, and it can't

19  be a moving target.

20         In our view -- and this is a view that would have an

21  impact on anyone else that files a rate court application -- at

22  a minimum, at the time that they made their rate court

23  application and relied upon Article 9 as a vehicle to have a

24  determination made of the rate for the repertoire, they were

25  entitled to have that day.  It can't be consistent with the

D98TPANA

pro-competitive and antitrust enforcement goals of the decree

to permit ASCAP and its members to circumvent your Honor's rate

setting authority.  And that's exactly what is happening here.

          THE COURT:  Well, if you could just return to this

question of the scope of the question I'll be asked to answer

in December when I conclude what the right rate is, what am I

looking at?  I understand you want me to think about the

repertoire as it existed on January 1st, 2011, but it's for a

five-year license.  And so to the extent a court can, I

assume -- and this is the same way the parties, if they were

negotiating, they would be sitting across a table from each

other and they would be saying:  OK, we're negotiating a rate

today and it's going to be inserted into a contract, a license

but it's for a five-year period.  So the fair rate over a

five-year period is perhaps different than what it would be if

it were just a license for one day, today, because we project

over this five-year period the industry is going to grow or

shrink in the following fashion, music has become more or less

valuable because of the following usages, the repertoire is

going to grow or shrink because of the following whatever.  And

therefore, even though we're setting the rate today and it's

going to be fixed in a document and govern this for five years,

we have to make an assessment about what it's capturing over a

five-year period.

          Is that fair or not fair from your point of view?

D98TPANA

1          MR. STEINTHAL:  I think it is fair, and I think the

2     key is to talk about it in the works in the repertoire.

3     Because as I said earlier, if a given writer exits and goes to

4     BMI or SESAC, there is going to be that flow back and forth,

5     and that tends to balance out over time.  The works we're

6     talking about here are not exiting, they're still there.

7          THE COURT:  Yes, I'm with you there.

8          So is there a mechanism -- and I know that I'm about

9     to hear from ASCAP, so it can fill me in on all the sort of

10    more practical aspects of this, but from your knowledge on

11    behalf of your client in dealing with ASCAP in negotiations

12    like this, is there a discussion about the fact that the

13    repertoire is likely to shrink or grow over the five-year

14    period or certain music uses are going to become even more

15    valuable or less valuable over five-year period?

16         MR. STEINTHAL:  I think, your Honor, the answer is in

17    the history of ASCAP they have always issued blanket licenses

18    subject to an occasional direct license here and there.  A

19    direct license, unlike these direct licenses, because the works

20    remained in ASCAP's repertoire in full.  So I think that in the

21    normal negotiation there's an expectation that all of the works

22    in the ASCAP repertoire, subject to some movement in and out,

23    will be there, and because it's a blanket license, what goes

24    up, what goes down, you're paying for what ASCAP always told,

25    access, immediate access, indemnification.

D98TPANA

1              And I could point you to the justificatory memo of the

2     government back when AFJ2 was determined, and they too spoke

3     specifically of some of the values of the blanket license.  And

4     in particular -- and this is important to your question that

5     you just raised, and this is on page 8 of Exhibit K to ASCAP's

6     brief, it refers to:  In addition, the PROs' practice of

7     offering blanket licenses can benefit users by providing broad

8     indemnification against infringement; immediate access to works

9     as soon as they are written; and flexibility in making

10    last-minute changes in performances.

11             Your Honor, those are some of the values you heard

12    from ASCAP time and time again of the blanket license.  Those

13    values are being, if not totally, substantially eviscerated.

14    If what we have left is a tiny fraction of the repertoire that

15    we have come to know and license in prior proceedings before

16    the rate court and in negotiations.  Some of the very -- that's

17    why we need to know now, and I believe if you accept our

18    position -- and as I said, this position may have broader

19    impact to others, but for me, my mother used to say:  I don't

20    care about others, I only care about you.  I only care about

21    Pandora right now, and I care about the fact that we relied on

22    Article 9 of the decree in bringing a proceeding, and at that

23    time we were entitled to all the works in the repertoire.  And

24    let's talk about those definitions in a moment.  There's no

25    question, your Honor, no question at all, that all of these

D98TPANA

1   works were in the repertoire before these so-called publisher

2   withdrawals of new media transmission rights occur.

3          So even if the publisher withdrawals might be

4   consistent or whatever the word is with certain provisions or

5   interpretations of the decree, it's not consistent with Article

6   9.  And so the combination of Article 6 and Article 9, the

7   mandatory provisions of Article 6 requiring ASCAP to issue a

8   license to any user for all works in the repertoire, coupled

9   with Article 9, which gives us the license from the point in

10  time when we apply until the proceeding is over, you can't pull

11  the rug out from under that license.

12         And your Honor, I understand there are broader

13  implications, and I will come to that, but all you say right

14  now is I agree with that proposition, you can't pull the rug

15  out under the combination of Article 6 and Article 9, you can't

16  take away that Article 9 right from a licensee.

17         THE COURT:  Well, I don't know.  It seems to me if EMI

18  had withdrawn entirely and taken all of its works away from the

19  repertoire in the middle of your license period, I think that

20  your license wouldn't cover those works.

21         MR. STEINTHAL:  And your Honor, as I said, there is

22  going to be -- subject to certain provisions of ASCAP's own

23  making, and that's the issue of whether they're going to treat

24  certain entities as having the rights to their repertoire until

25  the duration of an existing license, put that aside, that's not

D98TPANA

1    the issue on this motion really.  The question is if the works

2    were removed in their entirety, I would tend to agree with you,

3    that it's the prerogative of a member to withdrawal entirely

4    from ASCAP.  It's not the prerogative, as long as we live under

5    AFJ2, to leave the works in for everybody else and deprive them

6    to Pandora.  It's just not.  And it's especially so because it

7    will pull the rug out from under an existing licensee with a

8    consent decree license.

9           That's why I'm saying, your Honor, you could decide

10   this limited to the Article 9 issue.  We can't allow an entity

11   that relied upon Article 9, and on the day they applied they

12   were entitled to all the works in the repertoire.  And these

13   works remain in the repertoire.  They have not been withdrawn

14   in full.  They have not been removed.  They're in the

15   repertoire.  We're spending a lot of time on very important

16   issues without getting to the specific questions.

17          THE COURT:  I'm sorry, that's because I keep

18   interrupting you.  But one of the themes of your briefing is a

19   concern about being put in a disadvantageous position vis-a-vis

20   your competitors who may be applying or may have applied for an

21   ASCAP license post withdrawals.  Did I understand that

22   correctly?

23          MR. STEINTHAL:  Well, our primary submission on that,

24   your Honor, is our primary competitors are owned and operated

25   by entities that are part of the RMLC, and the RMLC has been

D98TPANA

treated by ASCAP in a fashion whereby they have been permitted
to make new media transmissions without being subject to these
exclusions, and under a rate structure that is the rate
structure that we believe is right or appropriate for Pandora.
It is central to our position that one of the reasons why your
Honor has to ultimately rule this way is because we would
otherwise be discriminated against under the decree.

          THE COURT:  Yes, and I don't want to get into the
discrimination issue.  I am not going to enter a decision
deciding summary judgment on a discrimination theory.  There
are too many facts in dispute and I couldn't do that.  It's not
a clear enough and pure enough legal issue for me.

          But I had read your brief, and I think maybe now
incorrectly, to be concerned about a different issue, that is,
that new media music users would seek an ASCAP license after
these withdrawals and have a substantially different rate and
you would be competitively disadvantaged because of that.

          MR. STEINTHAL:  Your Honor, our competitive
disadvantage would be relative to our primary competitors.
Hypothetically -- I'm not following that question, because our
view is our primary competitors are broadcast radio entities
with whom we compete for audience and ad revenue and the
internet radio services primarily owned by them.  So the
reality is the entities that have stand-alone internet radio
operations have primarily up to this date been owned by

D98TPANA

1    entities owned by the RMLC.

2           You're postulating something else, which is what about

3    the other poor guys, that if they're not treated as standard

4    services -- and many of them have been, so they're getting a

5    full blanket license from ASCAP.  They're being treated

6    differently than us in the sense that they're being given

7    access to the whole repertoire not subject to these withdrawals

8    because they're tiny, and because the publishers basically

9    don't want to go through the trouble of licensing them.  So

10   you're correct, maybe the passage that you're referring to is

11   that we say that we're being discriminated against in two

12   respects, against the RMLC entities, who are our primary

13   competitors, and even against the smaller internet-only guy who

14   are being treated to standard services because they don't get

15   subjected to the publisher withdrawals.

16          THE COURT:  Thank you.

17          MR. STEINTHAL:  So let me try to quickly go through

18   some of your questions.  And I have a lot to say, but I'll try

19   make it quick.

20          The first three questions, your Honor, are quite

21   interrelated, and what I thought I would do is address question

22   three first because it's just the shortest and simplest, and

23   then go back to one and two.

24          So your question three was whether the term "works" as

25   used as throughout means compositions or rights in

D98TPANA

1    compositions.  This is governed squarely by the four corners

2    the of the decree.  We don't have to go anywhere else.  Section

3    2U, a work means any copyrighted musical composition, quote,

4    unquote.  There's no ambiguity, it doesn't turn on who the user

5    is, doesn't turn on what medium the user is in, it is what it

6    is.  The term rights and compositions to which your question

7    addresses is nowhere used in the decree ever.

8         Reading "works" to mean rights in compositions also

9    would lead to some incomprehensible matters within the decree.

10   For example, ASCAP repertoire would be defined as those rights

11   in compositions, the right of public performance of which ASCAP

12   has or hereafter shall have.  You can't have a right of public

13   performance of a right.  It just makes no sense.  Substituting

14   rights in compositions for the word "works" elsewhere in FLJ2

15   elsewhere similar result.  I refer to section 2H, 2L, 2P, 2R,

16   Section 6, Seven 7, Section 9 in various places.  This one is

17   lock, stock right there, your Honor.  There's no question as to

18   question number three.

19        So let me move to question number one.  The question

20   here, your Honor, was whether a musical composition, which

21   ASCAP has the right to license to traditional media users but

22   not to new media users constitutes a work in the ASCAP

23   repertoire in the meaning of the second amended final judgment.

24        Our answer is yes.  It is a work in the ASCAP

25   repertoire.  Any composition ASCAP can license to its

D98TPANA

traditional licensees but purportedly is no longer licensable
to new media services is unequivocally still a work in the
ASCAP repertoire.  There is no basis in the decree to carve up
a work by user, by medium or otherwise.  Never does the decree
speak to portions of a work or to segregable rights within a
unitary work.  It is what it is.

         The proof is in the pudding as well.  ASCAP has
conceded over and again that the works remain and the works
purportedly withdrawn remain works in the ASCAP repertoire, and
that the publisher withdrawals have not resulted in making them
outside of the ASCAP repertoire.  If you go to the ASCAP web
site, and we cite this in our reply brief, once you registered
your works with ASCAP, they become part of the ASCAP repertoire
for which we collect performance royalties.  It's as simple as
that.  If it's a work, an ASCAP work, it's in the repertoire.
There's no way to divide it up.

         There's also something called the ace database
available on the ASCAP web site which says it is a searchable
database that contains information on compositions in the ASCAP
repertoire.  All of the supposedly withdrawn works of BMI and
Sony remain listed.  They have an asterisk which says they may
not be available to certain licensees, but are they listed as
works within the ASCAP repertoire?  Absolutely, your Honor.  No
disputing that they are.

         If we look at the definition of blanket license under

D98TPANA

the decree, blanket license, quote, unquote, authorizes the use

of ASCAP music.  What is the definition of ASCAP music?  ASCAP

music in 2B means any work in the ASCAP repertoire.  It's all

quite circular, your Honor, in the sense that it all comes back

to one thing, the repertoire consists of works.  The works are

not divisible.

So the answer to this question, and I -- there are a

couple of other things I could refer your Honor to, but for

now, I think unless your Honor has any question about that

particular issue, we have cited in our brief the portions of

the RMLC ASCAP agreement that make no sense if the answer to

this question is anything other than its a work in the ASCAP

repertoire.  There's a difference -- and even ASCAP has

recognized this, there's a difference between rights in a work

and works, and the decree speaks only of works.

Let me move to question number two, and again, this is

all interrelated.  The question is whether in the AFJ2 section

2C definition of ASCAP repertoire as, quote, those works the

right of public performance of which ASCAP has or hereafter

shall have the right to license at the relevant point in time

the phrase right to license means the right to license to any

user or the right to the license to a specific applicant.

Obviously, our view, and we believe it is clear within

the confines of the four corners of the decree, it means the

right to license any user.  Repertoire, as I said, is defined

D98TPANA

1   by reference to works.  Even in this definition, it's defined

2   as those works defined by reference to works.  Works are

3   compositions, they're decidedly not subsets of rights within

4   compositions.

5          I think one thing that we didn't address in our brief

6   that might be informative here, there's a definition in the

7   decree for right of public performance.  Neither party gave any

8   attention to this in their brief, but if you look in 2Q of the

9   decree, this is the only place really where you see what does

10  the word right mean when it's used in the decree?  This is what

11  it means.  The right of public performance to which the

12  definition of repertoire refers is itself a defined term.  It

13  means "the right to perform a work publicly in a non-dramatic

14  manner," which it then refers to as the small performing right.

15         This is meant, your Honor, to be explicit in limiting

16  the sole type of copyright right that ASCAP may license, the

17  small performing right.  This distinguishes is from the grand

18  rights that you heard about from time to time, such as live

19  theater performances that ASCAP does not license or sync rights

20  that ASCAP does not license.  So the right of public

21  performance is a defined term in order to clarify that ASCAP

22  licenses non-dramatic performing rights only.

23         So back to your Honor's question whether AFJ2's

24  definition of the ASCAP repertoire, insofar as it refers to

25  those works that ASCAP has the, quote, right of public

D98TPANA

performance, that defined term to license, your question was

whether the phrase right to license means the right to the

license any user or the right to license to a specific

applicant.  And the answer is very clear, there is no

delineation, there's no limitation by user anywhere in the

decree.  This reference to the right of public performance is

to the limitation on ASCAP's overall licensing power, which is

to license non-dramatic performing rights.  There's nothing

that would permit the interpretation that ASCAP is permitted to

limit it by user or by medium.

        The full answer, apart from looking at these

definitions of terms, now let's look at your question more

broadly in the context of the degree.  Article 6 is the answer.

Article 6 says, quote, ASCAP is hereby ordered and directed to

grant to any music user making a written request there for a

non-exclusive license to perform all of the works in the ASCAP

repertoire.  Any music user, your Honor.  Doesn't say to a

specific applicant.  Any music user and all of the works in the

ASCAP repertoire.

        We were trying to find some things we could focus you

on that were in the public record.  So I'm going to ask your

Honor to take a look at a presentation made in early 2011 by

ASCAP's then general counsel, which I think makes unequivocal

the point we're making about Article 6.  And this is

presentation that was given at Columbia Law School.  This just

D98TPANA

1    puts the nail in the coffin on this whole argument about so far

2    as it corroborates exactly what the decree says.

3           If you look at the first full slide, it says an ASCAP

4    license unappreciated and undervalued.  A license application

5    frees music users to perform publicly all the 8.5 million works

6    in ASCAP's repertoire.  Then it goes on, and then if you turn

7    the page after talking about the immunization and preclearance

8    transaction cost savings, what is the source of this freedom?

9    This is a really interesting question and answer.  What is the

10   source of this freedom?  Answer:  ASCAP's consent decree.

11   Article 4, which I think is a transposition, it should say

12   Article 6, the second amended final judgment, and then quotes

13   exactly the passage in Article 6.  ASCAP is hereby ordered and

14   directed to grant any music user making a written request there

15   for a non-exclusive license to perform all of the works in the

16   ASCAP repertoire.

17          So it's crystal clear, your Honor, both in Article 6

18   and in what ASCAP's then general counsel was referring to as to

19   how the decree effects ASCAP's licensing, that the answer to

20   this question had to be any user, not to a specific applicant.

21          Now let's move to question four, whether AFJ2 6 -- and

22   this is the nub of where we're getting, your Honor -- prohibits

23   ASCAP from accepting partial assignments of public performance

24   license and rights in a composition and requires ASCAP to

25   license either all public performance rights in a composition

D98TPANA

1     or no rights in a composition.

2            The import of our arguments about the definitions of a

3     work, the definitions of ASCAP repertoire, the blanket license

4     of ASCAP music, the implications of our argument coupled with a

5     mandatory licensing obligation of Article 6 requiring ASCAP to

6     license any music user all of the works in the ASCAP repertoire

7     certainly suggests that the current consent decree language

8     obligates ASCAP to license all rights, that there's no ability

9     to license subsets of rights and works or subsets of media.

10            But to be clear, as I said at the beginning, your

11     Honor, you don't have to go that far in order to give Pandora

12     what it requests by its petition and in this case in the sense

13     that we have requested a determination that our consent decree

14     license cannot be diminished after the time we've effectively

15     gotten our consent decree license.  And so your question four

16     is broadly:  Are these publisher withdrawals permissible at

17     all?  That's how I read your question four.  Can we harmonize

18     this form of partial withdrawals that leave works in the

19     repertoire unequivocally but purportedly allow ASCAP to license

20     some users with those works and not others?

21            I think the implication of our arguments, if you

22     follow them, it's problematic under Section 6 of those

23     definitions.  No question about that.  Having said that, that's

24     a broader issue.  It's more than I need to bite off right now.

25     I'm concerned, as I said before, about Pandora and what we came

D98TPANA

```
 1    to your Honor for.  You might say there are policy issues there
 2    I don't want to get to.  You might, I don't know.  I think the
 3    decree says what it says and the implications are what they
 4    are, and the Justice Department -- again, there's an
 5    interesting part of the Justice Department memorandum.  If you
 6    turn to footnote 10 on page 9, in talking about the history of
 7    the decree, the Justice Department says technologies that allow
 8    rights holders and music users to easily and inexpensively
 9    monitor and track music evolves rapidly.  It goes on and says
10    the department is continuing to investigate the extent to which
11    the growth of these technologies warrants additional changes to
12    the antitrust decrees against ASCAP and BMI, including the
13    possibility that the PROs should be prohibited from
14    collectively licensing certain types users or performances.
15           It may be, your Honor, that there are policy reasons
16    that would suggest the decree should be amended to allow ASCAP
17    to do what it wants to do, but when we made our consent decree
18    application, that wasn't the decree.  And the decree as it now
19    stands unequivocally says what it says.  And so I think your
20    Honor may very well believe that, just based on the definitions
21    I have been talking about and Section 6, these withdrawals are
22    problematic.
23           You may want to say that's broader than I need to
24    worry about.  Maybe I want more evidence on it.  I don't know
25    how your Honor is thinking about it.  My point is that you
```

D98TPANA

don't have to go that far.  I think on its face it's clear.
These publisher withdrawals are problematic.  I personally
don't know how to harmonize the definitions I talked about and
Section 6, the mandatory licensing obligation, with this form
of partial withdrawal.  I don't think it can be harmonized.

If you don't want to go that far, you don't have to.
That was not our position going in.  Our position going in was
very simply this:  We had a license to all the works in the
repertoire on January 1st, 2011, and asked for and effectively
got by complying with the notice provisions of Article 9 a
license for the period January 1, 2011 to December 31, 2015.
That license defined -- and again, this is where we'll talk
about works may come and go, so that if a publisher withdraws
or a member withdraws lock, stock and barrel and takes their
rights and goes to license them through BMI or SESAC or on
their own, not through a PRO that's what it is.  But that's not
what happened.

What happened is the works still reside in the
repertoire, and what ASCAP is trying to do is say:  I know I
agree that on January 1, 2011 you had the right to perform all
of the works on Pandora, and you were effectively licensed by
virtue of your consent decree license.  How can it be -- and
this goes to part of the questions five and six and the purpose
of the decree -- how can it be that Pandora can be punished by
having exercised its right to apply for its license under

D98TPANA

Article 9 by having publishers selectively withdraw -- not

remove, but selectively say to ASCAP:  I'm not going to let you

license them any more, those guys.  Those are the guys that

went to court to try to get a rate set.  There's no way that

could be harmonized with the purpose and intent of the degree.

That's why, on top of my concerns under Article 6 and

the definitions I talked about, this is a subversion of Article

9, plain and simple.  Article 9 gives us the right to a

license.  9A requires ASCAP to give a license to any, some, or

all of the works in the ASCAP repertoire.  9E provides that

pending the completion of any negotiations or proceedings

regarding the reasonable fee for a license requested pursuant

to 9A, the music user shall have the right to perform any,

some, or all of the works in the ASCAP repertoire to which its

application pertains.  These provisions, your Honor, guarantee

to music users like Pandora who requested blanket license

pursuant to 9A, the absolute right to publicly perform all of

the works that they request to license for.  We requested a

blanket license to all the works.

The language of AFJ2, your Honor, couldn't be any more

clear that, we, Pandora, under Article 9, on top of all the

other issues, the rate court jurisdiction can't be subverted in

the manner that ASCAP is trying to do.

And that answers number seven.  That solves the

problem.  Because if you agree with us that this can't happen,

D98TPANA

1   we can't have these sea changes in the size of the available

2   repertoire between the time somebody has invoked the rate court

3   protection and the time we get to trial, that's a simple

4   ruling.  It doesn't go as far as all publisher withdrawals of

5   this nature can't be harmonized.  This is a simpler, not as

6   broad ruling that basically says you can't undermine Article 9.

7   Whatever may be said about your attempt to do partial

8   withdrawals under the decree, you certainly can't do it this

9   way to an entity that at the time they applied for a license

10  had a license to all the works in the repertoire.

11          Now let me come back to your question about what works

12  that might be withdrawn midstream.  If works are withdrawn,

13  they're withdrawn.  Historically works have come and gone.

14  That balances out.  That's not what is happening here.  The

15  works are still there, they're just not being permitted to be

16  licensed to us.  That's the problem.  And the way it's been

17  handled, we're going from an entire blanket license to all the

18  works, to a hundred percent of the ASCAP repertoire at the time

19  we applied, to what is likely to be less than 25 percent of

20  ASCAP of that repertoire come next year.  And how do we deal

21  with that?  How do you deal with that?

22          THE COURT:  Well, I assume what you're asking then is

23  that in the December trial I value a license for all the works

24  in the ASCAP repertoire for all the public performance rights

25  that ASCAP can give under the consent decree, and then you have

D98TPANA

1   separately paid for a license that was therefore unnecessary,

2   and you're going to ask for an offset.  I assume that's the

3   math.

4           MR. STEINTHAL:  Yeah.

5           THE COURT:  And then if that's what happens, if, if,

6   if, ASCAP receives less money from you, the major publishers

7   who have already received these payments from you would not

8   really, I suppose, in ASCAP's view, be entitled to

9   reimbursement of your licensing fees.  So your net payment to

10  ASCAP is going to be distributed among the, let me just say

11  smaller publishers and other artists who are compensated by

12  ASCAP.  But they're going to get a smaller percentage share

13  than they would otherwise have received unless the rate set by

14  this rate court is equivalent to the license you've paid to the

15  large publishers, so that the offset is equivalent to what

16  would have been distributed to the major publishers by ASCAP.

17          So now the smaller publishers and other artists within

18  ASCAP have really been harmed, and the major publishers have

19  been advantaged.  Now ASCAP does or doesn't have contractual

20  rights for reimbursement in these circumstances to make its

21  other members whole, I don't know, but in some ways these

22  practical issues that stem from these historical facts are not,

23  I think, for me to figure out, they're ASCAP's problem.  All I

24  have to figure out is what is the right rate in December.

25          But one can't help but think about the practical

D98TPANA

1    implications of this.  I assume, and we'll talk about this in

2    December, but I assume from Pandora's point of view it would

3    love the major publishers to stay within ASCAP.  It's one-stop

4    shopping, you negotiate and pay a single licensing fee and it

5    covers the universe.  You don't have to engage in separate

6    negotiations.  All the advantages that ASCAP offers the world

7    of artists and publishers in terms of all those back office

8    operations, collection and distribution, performed with

9    relatively reasonable overhead, I guess.  I don't really know

10   I'm not asked to judge that right now, but let's just assume

11   that, that the entire industry, both music users and the

12   artists and publishers, are advantaged by having the mechanism

13   provided by the PROs.

14          MR. STEINTHAL:  May I respond?

15          THE COURT:  Yes.

16          MR. STEINTHAL:  I think the issue is in some cases not

17   as complicated and not as simple as what your Honor said.  In

18   respect of what we expect would happen, assuming your Honor

19   would agree with our position here, is that you would make a

20   determination of the value of the ASCAP repertoire as if none

21   of the publisher withdrawals have taken place.  It's that

22   simple in that respect.  Then we don't have to get to the

23   issues I was saying before, the moving target issue.  That's

24   problematic.

25          And if that is the case, if we have got to go to trial

D98TPANA

1    over what's left in the repertoire, either what's left as of

2    December or after Warner/Chappell pulls out in January or

3    whatever, that's a whole different level of proof that we would

4    need to be prepared to adduce to you.  And it goes to what the

5    Justice Department was talking about and what your Honor was

6    just talking about.  There are certain benefits when all of the

7    rights are available in one place.  But those benefits are

8    disappearing in a world if ASCAP's views about these publisher

9    withdrawals are permitted to go forward.

10           So the simple part of it is if you agree with us on

11   this motion, trial is much simpler.  You're going to set a fee

12   for the entirety of the ASCAP repertoire, and how we deal with

13   the fact that we paid EMI and Sony for short period of time

14   under direct licenses, I'm not sure exactly how we're going to

15   do that yet, your Honor, but that's a separate issue, and I'm

16   sure we'll be able to work it out, with your Honor's help if we

17   need it.  But it doesn't affect your rate setting as to what's

18   the value of the blanket license to Pandora as if none of the

19   publisher withdrawals had taken place.  You've done this before

20   in *DMX* where you had to factor in there was a direct license.

21   These are different direct licenses, much more pernicious, as

22   you'll see at trial, but still they're direct licenses, that

23   money has been paid directly to certain publishers.  We'll work

24   that out.  But from what do you have to do in terms of rate

25   setting, it's fairly simple if you agree with us on this

D98TPANA

1    motion.  You set the fee for the blanket, and if the parties

2    can't agree on what to do about the Sony and EMI payments, then

3    that's just a separate issue we'll have to address with you.  I

4    just don't know yet how we're going to deliver that to you.

5          You asked some questions about what happens with works

6    in full that might be withdrawn.  Again, it's not relevant to

7    this motion, ASCAP has treated -- in its own internal rules it

8    does basically tell its publishers and members that we will

9    start dealing with the fact that you've withdrawn it after the

10   duration of our license is in effect.  So that is one little

11   caveat that I think was worth mentioning.

12         And I think I have addressed the problems raised by

13   question seven and one through four.  And five and six, your

14   Honor, purely straightforward.  Yes, if there's any ambiguity

15   in AFJ2, the Court may look outside the four corners of the

16   decree for its purpose.  I have already addressed some of the

17   purpose issues including as for Article 9.  There are others in

18   the government's submission, AFJ2, supporting our

19   interpretation of Section 6 as being a mandatory compulsory

20   license to the full repertoire.  I think it's on page 22 of

21   their submission.  It's a full repertoire mandatory license.

22         I would be happy to answer any more questions that you

23   have, but I have been up for a long time.

24         THE COURT:  Thank you, Mr. Steinthal.

25         Mr. Cohen, do you wish a break?

D98TPANA

1              MR. COHEN:  No, I would like to proceed, your Honor.

2              THE COURT:  Thank you.

3              MR. COHEN:  If the Court needs a break we will.

4              THE COURT:  No, I will take a break after you're

5     finished and then we'll come back for further argument.

6              MR. COHEN:  So your Honor, we appreciate you hearing

7     us today and departing from your ordinary practice.

8              This does have profound implications.  While

9     Mr. Steinthal said five or six times he's only concerned about

10    Pandora, that's not what this motion has transformed itself

11    into.  And that's problematic in a sense because the decree

12    interpretation that is being suggested is not the decree that

13    ASCAP thinks that it signed.  And there are two parties to this

14    decree, one of them is not Pandora, and the other party isn't

15    here.  And what's critical about that, and we should talk about

16    that, because I will represent to the Court I talked to the

17    Department of Justice as recently as a couple of days ago, and

18    said you need to be here, because we at ASCAP don't think we

19    ever entered into a decree that said that our members had to

20    grant us all of the rights for all purposes or none of the

21    rights.  And that's what Mr. Steinthal posited, and I think

22    that's your Honor is coming with the questions the works are in

23    or out.  That's not the decree that I believe we signed.  It

24    was not discussed at the time of AFJ2.  I will go back, if your

25    Honor will indulge me, when it was once in the decree, which

D98TPANA

1    was 1941 to 1950, but that's not the decree that we signed.

2            And with all due respect to the Court, the questions I

3    think are chapter two.  The chapter one is does the decree

4    mandate ASCAP members or regulate what rights ASCAP's members

5    will give to ASCAP?  Does it require it to give it the rights

6    to all of the works.  And I don't see it in the decree, and I

7    would respectfully suggest that what has happened in the last

8    two and a half years suggests neither does the Department of

9    Justice.

10           So let me back up.  We went to the Department of

11   Justice, as I said to your Honor before, in January of 2011,

12   and said some of our members want to withdraw the new media

13   rights.  And if it were unambiguous in this decree that rights

14   were in or out, it would have been a simple thing for the

15   Department of Justice to say oh, no, no, no, that's not what is

16   permitted under the decree.

17           THE COURT:  If I remember correctly that affidavit

18   didn't indicate what the Department of Justice said, it says

19   what you said to them.

20           MR. COHEN:  And I have a document, your Honor, that

21   I -- I don't want to speak for the department, but let me say

22   as much as I can say, because I had this discussion with them

23   as well, and I think it's critical given the breadth of this

24   ruling.  They said to me you can't read anything from the fact

25   that we did not say it was a violation of the decree.

D98TPANA

1            But I'm making a different point, your Honor, because

2   this is a critical point of the decree interpretation that

3   really has to be based on unambiguous language and giving

4   meaning to an agreement that ASCAP and the DOJ think they

5   entered into.  And the point I'm making, your Honor, is if the

6   Department of Justice thought that works were either in or out,

7   and it was unambiguous under the decree, there's been two and a

8   half years for the department to say that.

9            THE COURT:  Now I'm sorry, but Mr. Cohen, the

10  government is a busy institution.

11           MR. COHEN:  But what I'm suggesting to your Honor is

12  the government ought to be heard on this before your Honor

13  rules is my respectful suggestion.  I will deal with

14  Mr. Steinthal's issue, because I don't think we need to resolve

15  this on summary judgment.

16           THE COURT:  You asked them to speak and they have

17  declined to.  Have they now told you they would like to?

18           MR. COHEN:  They said they will respect the Court's

19  wishes.  They have not been invited by the Court to speak.

20           THE COURT:  I know if I ask for them to weigh in, I

21  expect, as a matter of -- well, as a result of many things that

22  they would, but that's a little different from what I'm

23  hearing.

24           Let me just be very frank, Mr. Cohen, because I'm

25  trying to be very frank.  You can tell from I think the seven

D98TPANA

questions that I don't find a lot of ambiguity here.

MR. COHEN:  I understand, your Honor.

THE COURT:  And I was very aware of the fact that I could ask for DOJ to be heard, and I considered doing that if I could find any ambiguity.

MR. COHEN:  Let me try to suggest an ambiguity, your Honor, and see if I can turn you around, because I think that the decree says nothing about the scope of rights that have to be granted by an ASCAP member to ASCAP except for in Article 4. And in 4A, which I think is the critical language, it says ASCAP is enjoined and restrained from holding -- if you're with me, 4A -- holding, acquiring, licensing, enforcing or negotiating concerning any foreign or domestic rights in copyrighted musical compositions other than rights of public performance on a non-exclusive basis.

The import of your Honor's ruling, if you go the way that you very candidly have said that you're leaning, is that a member cannot restrict anything from ASCAP for any purpose.  A member can say if I give you the work for some purpose, I cannot license it myself on an exclusive basis.  I am EMI and I want to give the NBC television network the exclusive right to perform my songs on television.  That happens in the rest of the world of rights.  It happens in sync rights, people make exclusive deals all the time.  Under this reading of the decree, if we're heading in this direction, that right has been

D98TPANA

1    taken away from the member.  It has been taken away from the

2    member.  And the effective reading of the decree becomes:  If

3    you join ASCAP, and you give ASCAP non-exclusive rights, you

4    cannot retain any exclusive rights for yourself.  Now that was

5    once addressed in the decree.

6              THE COURT:  Well, I think it has to be not a member,

7    but a work.  You could be a member, I assume, I mean I haven't

8    thought about this, and directly licensed rights to certain

9    works but give ASCAP the authority, the licensing authority

10   over other works.  So I don't think a member is in or out for

11   purposes of all works.

12             MR. COHEN:  Then I think I misspoke, your Honor,

13   that's not what I meant to suggest.

14             THE COURT:  OK.

15             MR. COHEN:  What I am saying is I don't see anything

16   in this decree -- let me try to put it in real world context --

17   that says somebody comes to ASCAP -- a new member, forget

18   EMI -- and says I have a group of songs I want to license to

19   the radio industry myself, I want you to license everyone else.

20   I don't want you to license the radio industry.  I do not

21   believe the decree addresses that.  And because those rights

22   have not been taken away from the copyright holders, that are

23   also sort of not here, but the copyright holders who think they

24   can decide the scope of what they're going to give ASCAP to

25   license.  And the decree is silent on that.

D98TPANA

1          The effect of where your Honor is leaning,

2     Mr. Steinthal's argument, is to say you can no longer do that.

3     Because EMI's withdrawal is a bit of a misnomer.  EMI's

4     membership was up for renewal.  And we had some testimony about

5     this and some is restricted under the protective order, so I

6     want to be careful.  But EMI's membership was up for renewal,

7     and they essentially, I would say, said I'm out and I'm giving

8     you everything back but the right to license this class of

9     music.  And I don't think anything in the decree prevents that,

10     that EMI has the right with respect to certain users to reserve

11     for itself the exclusive right to license.

12          What Article 4 says, Section 4 of the decree says is

13     ASCAP can't get exclusive rights.  As long as ASCAP -- whatever

14     rights ASCAP has, as long as they're non-exclusive, that's

15     fine.  But I see nothing in the decree -- and I'm going to come

16     back to the '41 decree in a minute because I think it's really

17     quite critical.  I see nothing in the decree that says to a

18     copyright owner if you let ASCAP license anybody, you have to

19     let them license everyone.

20          Now we know that isn't true, because let's look at

21     motion picture theaters.  There's an express exclusion here.

22     If I am the owner of the Lowe's 34th Street and I want the

23     performing right for EMI's music.  And I go to EMI and they say

24     it's $100,000.  I say that's too much money, and I go to ASCAP

25     and I say ASCAP, I would like to license the performing rights

D98TPANA

1    from you.  These are works in the performance repertoire.  All

2    the songs I want are in the ASCAP repertoire and I want the

3    right of public performance for my motion picture theater.

4    ASCAP can't do that.  The decree says they can't do that, they

5    can't license to that class of user.  That's by decree.  So we

6    know there are types of users that ASCAP can't license.

7             Let's look at 4F.  I think that is also quite critical

8    of the decree.

9             THE COURT:  OK.  I did not understand your example

10   about motion picture theaters.  What are you referring to?

11            MR. COHEN:  In the decree, your Honor, I'm referring

12   to 4E.  My apologies, this is the so-called Alden-Rochelle rule

13   you'll remember.  So if a motion picture --

14            THE COURT:  OK.  So you're saying under 4E that there

15   is a specific provision in the consent decree dealing with a

16   class of users.

17            MR. COHEN:  Correct.  Which is inconsistent with the

18   notion that a work is either in or out.  It's clearly out with

19   respect to this class of users.  I understand the decree says

20   that, I'm going to move on to the next example, which is 4F.

21   And the second half of 4F says a member in interest -- let's

22   call them EMI or Sony, since that's what we're talking about --

23   irrespective of work -- but I don't think it's limited to one

24   work -- can direct ASCAP to restrict performance of a work in

25   order reasonably to protect the work -- and skip the first

D98TPANA

1    clause -- for the value of public performances rights therein.

2    So EMI can say to ASCAP I don't want you to license any more

3    these works, my works, to these users, because I think that

4    will diminish the right of my -- the value, diminish the value

5    of my public performance rights in my compositions.  That is

6    essentially what happened here.

7             THE COURT:  Oh, no.  No.  In fact, I would say 4F is

8    not very helpful to you.

9             MR. COHEN:  Your Honor, let me try -- I think

10   ultimately you'll have to decide, but let me try to articulate

11   my argument a little more and see if I could be helpful.

12            THE COURT:  OK.

13            MR. COHEN:  What the publishers who ultimately

14   withdrew their new media rights said was that we don't think

15   ASCAP is deriving the appropriate value from the performance of

16   our works by this class of users.  So now the question is:  Is

17   there something in the decree that says works are either in or

18   out, or is there some wiggle room in the decree with respect to

19   works not being in or out?

20            And what I'm say willing to your Honor is the members

21   have the right to direct not to license to specific users.  And

22   a user who said I have all of the works in the ASCAP repertoire

23   because I have applied, has to confront Section 4F if a member

24   says to ASCAP no, you may not license them.  So those are works

25   in the ASCAP repertoire for users, and the members have the

D98TPANA

1    right to restrict -- to instruct ASCAP to restrict those

2    rights.

3           And what I'm suggesting to your Honor with respect to

4    both Alden-Rochelle, 4E, and this provision in 4F is that the

5    decree does not solely deal with works that have to be

6    available to all users.  That there are certain circumstances

7    under which a work which is otherwise in the ASCAP repertoire

8    is either not available to a class of users or to particular

9    users at the direction of the member.

10          And that leads me back, your Honor, to where I

11    started, which is does the decree tell us at all, does it

12    say --

13          THE COURT:  Excuse me one minute, I want to read 4F.

14          I don't think you had focused on 4F in your briefing.

15    I'm sorry if you did and I overlooked a careful reading it.

16          MR. COHEN:  We mention 4F in the brief but obviously

17    your questions drew this out in more detail.  It's in the 20s

18    somewhere, maybe page 22 of our brief.

19          THE COURT:  But this could be read to support

20    Pandora's position that if the rights holder is concerned that

21    there is indiscriminate performance of music occurring, the

22    rights holder's options are to remove the work from the ASCAP

23    repertoire or to ask ASCAP to restrict performance of the work.

24          MR. COHEN:  Yes, I don't read --

25          THE COURT:  It doesn't have this ASCAP can continue

D98TPANA

1    unrestricted licensing for some music users and then we'll go

2    and separately license others.

3          MR. COHEN:  I understand that, your Honor.  I would

4    say two things in response, if I may.  One, I think there are

5    two clauses here, the indiscriminate performance is one clause.

6    As I read 4F, it's a separate clause with respect to protecting

7    the value because of the "or perform the value."

8          And the second thing I would say, what I am trying to

9    respond to is:  Does the decree unambiguously put works in or

10   out for all users?  And what I'm suggesting to your Honor is

11   that with respect to 4E and 4F -- and you're right, we did not

12   spend an enormous amount of time in our briefing, but I will

13   try to be responsive to your Honor's question.  With respect to

14   4E and 4F, there are circumstances clearly contemplated by the

15   decree where there are works in the ASCAP repertoire that ASCAP

16   has the right to license it to some users and not to other

17   users either by definition for motion picture theaters or by

18   direction of the member.

19         That takes me back to 4A, your Honor, if I may, which

20   is I would suggest that if the decree intended to say

21   unambiguously -- intended to say unambiguously that members had

22   to give ASCAP the right to license all users or none, the place

23   for the prohibition would have been in 4A.  Because 4A is the

24   only place that governs the granting of rights that could be

25   acquired from ASCAP from its members.  And it says you can't --

D98TPANA

```
 1   the only right that you can get is the domestic -- are domestic
 2   rights and copyrighted musical compositions, you can't get
 3   anything other than rights of public performance on an
 4   exclusive basis.  Now that wasn't always true.  If your Honor
 5   will indulge and me and I could hand up the 1941 decree,
 6   because I think the history of the decree matters here.
 7           May I, your Honor?
 8           THE COURT:  Yes, absolutely.
 9           MR. COHEN:  And this is an exhibit to our papers, it's
10   Exhibit H to Mr. Johnson's affidavit.
11           THE COURT:  Do you have a second copy, please?
12           MR. COHEN:  Yes, of course.
13           This is the 1941 decree.  This is the original consent
14   decree.  And I want to focus your Honor, if I may -- I want to
15   apologize for the typeface, it's not easy -- on section -- it's
16   numbered kind of strangely, but on the second page, it's after
17   Roman Numeral II, and the first paragraph is actually supposed
18   to be numbered paragraph one, not I, so that's 2(1) and 2(1) --
19   and this was not in the papers, this was in response to your
20   questions.  We did cite some part of this but not this
21   particular section for this purpose, 2(1)(c).  And your Honor
22   could parse through the language, but what this says is the
23   first part of Section 2(1) is a little like Section 4 of the
24   current decree.  It basically says ASCAP can only get
25   non-exclusive rights.  You can't get -- that's, of course, the
```

D98TPANA

fundamental antitrust rationale for why the Supreme Court said

ASCAP was not a per se violation.

It then goes on to say in the rest of Section 2(1),

notwithstanding herein contained -- or nothing, I'm sorry,

herein contained shall be construed as preventing ASCAP from --

I go to C -- prohibiting the members from issuing exclusive

licenses to commercial users for using.

So in 1941, if EMI -- if EMI existed then,

Warner/Chappell had come to ASCAP and said I'm giving you the

rights of public performance, but except for, with respect to

my example before, NBC television network, I have exclusively

licensed TV to NBC, ASCAP could say you can't do that.  That

provision has been gone from the decree since 1950.  It was

removed in AFJ, it continues to be removed in AFJ2.

And the importance of it, your Honor, if you bear with

me, because it's hard to work our way through the text of these

things, but it's important to say since 1950 members have been

free to give exclusive licenses to commercial users.

And I would say that is exactly what has happened

here.  EMI has essentially said, with respect to or EMI and

Sony and whatever partners withdraw, with respect to this class

of users, I am going to license that exclusively.  I am giving

you, ASCAP, a non-exclusive license with respect to everyone

else.  Under 1941 decree, that would not have been permitted.

It is the only time there was a restriction on licensing by

D98TPANA

1    members.

2              And again, your Honor, I think that was what I meant

3    by chapter one and chapter two is:  Does the decree at all deal

4    with the issue of what rights ASCAP members have to give to

5    ASCAP, what rights to license?  And I would say no.  And the

6    importance of that is I read every provision that Mr. Steinthal

7    addressed, Section 9, Section 6, the various pieces of Section

8    2 which I will deal with, is that a user is entitled to the

9    full extent of the rights to license that ASCAP has, subject to

10   these restrictions in Section 4.

11             So if ASCAP has the right to license only a class of

12   users, that class of users gets all of the works in the ASCAP

13   repertoire.  But I don't see anything in the decree, and it has

14   never been the understanding of ASCAP that the decree governs

15   what the grant of rights are from ASCAP's members, the

16   copyright owners, to ASCAP.

17             Now ASCAP has had conventions under its membership

18   agreement.  And let me give another example because I think

19   we're treading into a thin factual record here with some very

20   unintended consequences.  When an ASCAP member joins, they give

21   ASCAP the right to license not just in the United States but in

22   the United States and abroad.  And the decree you can see

23   doesn't prevent any kind of foreign licenses.  So Pandora could

24   have come to ASCAP and said I want a license for the United

25   States and for all of the rest of the world with respect to

46

D98TPANA

1    your members' music.

2            ASCAP members traditionally and historically -- this

3    is not before your Honor in terms of papers, but you'll see it

4    on the face of the membership agreement, which is Section 11 of

5    the membership agreement, it's on the web site and I can

6    provide a copy to your Honor, says that if you, a new member,

7    if you have already exclusively given those rights to a foreign

8    society, tell me which societies and which rights.

9            What does that mean?  It means that for some works

10   ASCAP has the right to license the whole world, and for some

11   works ASCAP has the right to license only in that part of the

12   world where the members have not already conveyed exclusive

13   licenses.  And what that means, your Honor, by definition, is

14   that a work is not a work is not a work, that some works are

15   available to all users, and some works are not available to all

16   users.

17           And while I understand how your Honor has parsed its

18   way -- the Court has parsed its way through this language, I

19   think there is an enormous amount of context in the licensing

20   history and in the fundamental purpose of the decree that is

21   not being addressed.

22           So to go back now to your questions, how do I deal

23   with the language that your Honor finds unambiguous, what I

24   would say is to go back, for example, to the ASCAP repertoire,

25   which I think everything flows from the ASCAP repertoire.  And

D98TPANA

```
1    I'm not disputing that a work is composition.  That's your

2    third question.  That's clearly it's defined.  That's, of

3    course, what it is.

4              THE COURT:  OK.  Well, in your briefs you --

5              MR. COHEN:  If we were being ambiguous in our briefs,

6    I withdraw that.  2U defines it as a work.  There's absolutely

7    no way for us to take a contrary position.  I think it was

8    because we were potentially so focused on license and effect,

9    which I will get back to in a minute.

10             So 2C, which is really the first question you asked,

11   means those works -- a work is a composition -- the right of

12   public performance of which -- and I agree with Mr. Steinthal

13   the right of public performance is a defined term -- ASCAP has

14   or shall have the right to license.  I don't find unambiguous

15   in that the right to license means the right to license for all

16   purposes for all of the reasons that I spent the last 20

17   minutes on, that there are a host of the circumstances where

18   ASCAP cannot license; cannot license movie theaters, can't

19   license foreign rights that have already been conveyed, can't

20   license what it has been told to restrict.  And I see nothing

21   in the decree that prevents a user from coming to say I can do

22   this better than you can, with respect, or made a decision to

23   license certain users before I decided to join ASCAP.

24             The other part of the decree that I think is

25   consistent with our reading that all that we're licensing is
```

D98TPANA

1    the full extent of what we have -- and I will come in a few

2    minutes to Mr. Steinthal's question how we deal with this in

3    the trial, because I don't think it's complicated and I don't

4    think it will advance the right to termination.  I will come to

5    that in a few minutes.

6           Let's go back to licenses in effect, and I think

7    Mr. Steinthal made some important concessions today.  Licenses

8    in effect.  Let's start with our licenses in effect, but I

9    think it doesn't make a difference, which is it's limited to

10   final licenses.  Mr. Steinthal conceded today that users

11   could -- members could withdraw works and repertoire would have

12   of course be fluid over the course of a license period.

13          So he doesn't get all of the works in the ASCAP

14   repertoire on the first day that he applies for a license, even

15   if it's the interim license which governs licenses in effect.

16   So if the ASCAP repertoire had to be the same for all users,

17   there would be no concept of licenses in effect because

18   depending upon the time in which a licensee applies or a user

19   applies, which license in effect will be different for

20   different users.  If I apply the day before EMI withdraws --

21   entirely forget the new immediate withdrawals, if I apply the

22   day before EMI withdraws, I get all EMI's music.  If apply the

23   day after, those songs are still in the ASCAP repertoire for

24   the people who applied the day before the withdrawal, because

25   their license is in effect, but they're out of the repertoire

D98TPANA

1    for users who apply after the effective day of withdrawal.

2            Again, the decree is much more complicated than is a

3    work in or is a work out.  It's what is the scope of licensing

4    rights that have been granted to ASCAP.  And ASCAP must convey

5    to Pandora and everyone else all the rights that it has.  But

6    those rights do not need to be and have not been all of the

7    rights in all of the works that its members have created.

8            So that flows through, from my perspective, to all of

9    these questions.  Everything is tied to what is the ASCAP

10   repertoire.  And what I would say, your Honor, is 2C says it's

11   the right of public performance, works, the right of public

12   performance of which ASCAP shall have the right to license.

13   And if a member says you have the right to license certain

14   rights of public performance but not other rights of public

15   performance, we reserved that for ourselves.  We want to deal

16   with that ourselves.  There is nothing in the decree that says

17   that the member can't make that decision.

18           And if the Department of Justice had intended to

19   extract from ASCAP and its members an agreement that works

20   would be in for all purposes or out for all purposes, the place

21   to do it would have been in Section 4 where it describes what

22   the relationship is with respect to the rights that ASCAP can

23   obtain.  And ASCAP could have been enjoined from obtaining less

24   than the full performing rights for all possible users, but it

25   wasn't.  And since 1950, when that provision of the 1941 decree

D98TPANA

1   that I mentioned had ceased to be part of a consent decree, the

2   members, the copyright owners, have had the right to make their

3   own decision.

4           ASCAP is a licensing agent.  ASCAP is a licensing

5   agent.  The principal, the copyright owner, can decide what it

6   wants to have its licensing agent license.  What ASCAP is

7   precluded from doing under the decree, except for some certain

8   exclusions that we have gone through, like 4F, is from

9   distinguishing between users with respect to the full range of

10  what it has been authorized to license.  That's what the users

11  get.  They get the entire ASCAP repertoire, which are the songs

12  for which ASCAP has the right to license public performance.

13  It doesn't say all public performance.

14          And what I'm concerned about, your Honor, with respect

15  to the reading of the decree, and I understand how your Honor

16  parsed your way through the decree from your questions, is that

17  we are fundamentally upsetting the -- unintentionally, the

18  relationship between the copyright owners and ASCAP by now

19  saying something that I think is just nowhere in the decree:

20  To be an ASCAP member, you must let them license your works to

21  anybody who comes along.  And not only may you -- not only are

22  you required to give them non-exclusive licenses, because

23  that's what the decree requires, you can no longer reserve for

24  yourself any of the licenses.  I don't see how that makes sense

25  under the decree particularly because what the decree is

D98TPANA

1      concerned about is the aggregation of rights.  This is the

2      disaggregation of rights.

3              And I want to say a few things about the purposes of

4      the decree.  Let me go there now.  I think your Honor is free

5      since the *Shenandoah* case in the Second Circuit that involved

6      ASCAP and the *Armor* case in the Supreme Court and various cases

7      that we cited on page 12 of our brief.

8              Your Honor can look to extrinsic evidence to interpret

9      the language, but I don't think we can broadly say we're going

10     to do something that is consistent with the purpose of the

11     decree.  There's a lot of case law that says decrees don't have

12     purposes.  Decrees are agreements.  They can't be stretched

13     beyond their terms, which is the essence of what I'm arguing to

14     your Honor is that we're heading into something that stretches

15     the decree beyond its terms.  But the purpose, whether it's

16     pro-competitive or anticompetitive or consistent with the

17     marketplace for performing rights, is not something that your

18     Honor should turn to in the interpretation of the decree.

19             Having said that, I will give my view about the

20     purpose in case your Honor disagrees.  These new media

21     withdrawals are entirely consistent with the purpose of the

22     decree.  The decree is designed to constrain ASCAP's market

23     power and to encourage direct licensing.  And these members

24     have pulled out of collective licensing for certain purposes.

25     In the same way that the courts have over and over and over

D98TPANA

1   found the program license to be a bridge to direct licensing,

2   this is a bridge to direct licensing.  Would it be more

3   consistent with the decree, if we can use that language, for

4   EMI to withdraw entirely?  Perhaps.  But anything that

5   disaggregates rights from ASCAP and requires users and

6   copyright owners to license those things directly is exactly

7   what the decree is intended to accomplish.

8         And that's the irony of where we are.  Mr. Steinthal

9   is saying I want ASCAP –– for 50 years of great court

10   litigation the users have come in and said we have to constrain

11   ASCAP, we have to encourage direct licensing, we have to allow

12   direct licensing.  We can't let ASCAP aggregate these rights

13   that's why the rate court is here.  And now when someone

14   disaggregates rights because the price happens to be higher ––

15   we'll deal with that at the trial –– they come in and say oh,

16   no, you must stop direct licensing.

17         It doesn't make any sense, your Honor.  Respectfully,

18   it turns the decree on its head.  It's completely consistent

19   with the purpose of the decree to allow copyright owners to

20   license directly.  Whether those direct licenses will be

21   benchmarks that your Honor will use at the trial, we'll get to.

22   If they think that the behavior has been collusive, which I do

23   not believe, they can bring a cause of action under the

24   antitrust laws.  But the fact of the matter is the decree

25   encourages direct licensing, and that's exactly what is

D98TPANA

1   happening here.

2           Now let me go to the last point, the seventh question,

3   if I may, because that's where Mr. Steinthal started, and I

4   have a fundamental disagreement.  He suggested to your Honor

5   that the trial will be simpler if we now define the scope of

6   rights and we resolve this on summary judgment.  I don't really

7   understand that, and let me tell you why.

8           Here's what I envision for how we would set rates, and

9   I think it's very similar to what your Honor said, and it's

10  similar to the agreements they entered into.  The direct

11  licenses that Pandora entered into says the fee overall for

12  performance rights -- overall, not just you, Sony or EMI, is X

13  percent, and you, Sony, will get some percentage of that

14  overall value of performance of music based on the number of

15  plays you have.  So a simple adjustment mechanism.

16          And that's exactly, your Honor, what I think will be

17  our proposal at trial.  So if we have 25 percent or 50 percent

18  or 37 percent of the plays on Pandora, it will self-adjust.  It

19  will adjust based on a mechanism.  They will not have to pay

20  twice.  Nobody thinks they should have to pay twice for the

21  same music.  Nobody on the ASCAP side says the withdrawals are

22  irrelevant to the value of the repertoire.  Of course it's

23  relevant to the value of the repertoire.  But the way to deal

24  with the dynamic repertoire over time is to decide what is the

25  value of the performing rights.  And they have done that in

D98TPANA

 1   their licenses.  They have said the amount of money that we're

 2   going to pay for performing rights is X percent.  And if ASCAP

 3   has 20 percent, it gets 20 percent of X.  If it has 40 percent,

 4   it gets 40 percent of X.  If it moves over time, the fee to

 5   ASCAP is dynamic.

 6            THE COURT:  Mr. Cohen, I don't actually understand the

 7   formula.

 8            MR. COHEN:  Let me try again.  I'm trying to, again,

 9   not to divulge in information under the protective order in

10   open court.  They entered into a license --

11            THE COURT:  No, we don't need to do it that way, just

12   what is ASCAP's proposal?

13            MR. COHEN:  Forget what the percentage overall will

14   be.

15            THE COURT:  What percentage overall?

16            MR. COHEN:  The percentage of their revenue.  ASCAP

17   will --

18            THE COURT:  Of Pandora's revenue?

19            MR. COHEN:  Yes, Pandora's revenue only essentially

20   adjusted by its share of performances on Pandora.

21            THE COURT:  ASCAP's share of performances.

22            MR. COHEN:  Correct, exclusive of what's been directly

23   licensed.  So Mr. Steinthal said what if we only have

24   20 percent of ASCAP's repertoire next year?  You only pay us

25   for what's left, so that if we have a 100 percent of the

D98TPANA

1    repertoire, we get a 100 percent of that number.  If 50 percent

2    of the repertoire has withdrawn its rights, we go to -- the fee

3    that's payable to ASCAP goes down proportionately, so that

4    we're taking into account in a dynamic way the size of the

5    ASCAP repertoire, which as I say is a proxy for its value.  I'm

6    not saying there can't be complications of it, but that's the

7    basic idea, that the rate should vary with either the size or

8    the number of performances.  So if ASCAP loses valuable parts

9    of its repertoire, Pandora will pay less to ASCAP.  Of course

10   they will.  And we don't need to decide in advance of the trial

11   this question to achieve that kind of result.

12          And that's the way they have -- that's the

13   significance of the licenses, your Honor, that's the way they

14   structured their licenses.  They structured their direct

15   licenses to vary with the number of performances.  We're

16   prepared to live with that.  We're prepared to buy into their

17   structure.  And if ASCAP's performances decline as a result --

18   on Pandora as a result of the withdrawal of certain members in

19   2014, or have declined over this period as a result of

20   withdrawals in 2011 and 2013, that will be reflected in what

21   Pandora pays to ASCAP, so that Pandora will get the benefit of

22   the reduced repertoire and it will negotiate what it negotiates

23   with the direct licensees.  But we will not get paid for music

24   that we no longer have.

25          THE COURT:  So the focus is going to be not on valuing

D98TPANA

1   the music in ASCAP's repertoire at any point in time, but

2   instead valuing the music that is on Pandora at some point in

3   time.

4           MR. COHEN:  And adjusting that -- I don't think

5   anybody ever tried to -- I think what I'm suggesting, your

6   Honor, is very consistent with kind of market share adjustments

7   that have historically been done by the rate court.  So if we

8   go back to the *Showtime* decision, there was a BMI benchmark,

9   and the rate court says ASCAP has 54 percent and BMI has 46

10  percent, so we will adjust the BMI rate by the fraction of 54

11  divided by 46.

12          I'm suggesting something similar to that, that we come

13  up with benchmarks -- we think their direct licenses are

14  benchmarks, but let's say we use music choice and say the right

15  rate is 2.5 percent for ASCAP, but ASCAP has now lost half of

16  its repertoire because of withdrawals in a given year, I would

17  say -- don't hold me to this as our proposal, but this is the

18  structure, that the rate is now 1.25 percent, that there has to

19  be a reduction in half of the ASCAP rate to reflect the fact

20  that half the repertoire has been lost.

21          So we don't need to answer, from my perspective, this

22  question of what is in and what is out on summary judgment on a

23  reasonably thin record.

24          THE COURT:  Well, the 2.5 percent is based on the

25  ASCAP repertoire as it existed January 1, 2011, and then if

D98TPANA

1       it's reduced behalf it's 1.25?

2                   MR. COHEN:  Yes, your Honor.

3                   THE COURT:  So you're saying that the value is as of

4       January 1, 2011, and that's what we're measuring.

5                   MR. COHEN:  No, your Honor, I think the value changes

6       all the time because there have been changes in the market.  So

7       it will be more complicated at trial.  So there are market

8       comparables.  They entered into the licenses in '11, they

9       entered into licenses, Pandora, in '13, direct licenses, and

10      those numbers are different.

11                  What I am suggesting is whatever the market value is

12      in a given year, and we're likely to come to your Honor with a

13      different rate for different years based on what we think the

14      market is for performing rights at that time, there will be an

15      adjustment to reflect the withdrawals.  I mean Mr. Steinthal

16      was suggesting, I thought, that ASCAP's position was that it

17      makes no difference whether there have been new media

18      withdrawals from the repertoire in terms of the fee that ASCAP

19      is seeking to charge.  That's not the structure of our fee

20      proposal.

21                  THE COURT:  So your fee proposal is saying for each of

22      the five years there may be a different value to music rights.

23      For each of the five years we're going to do a calculation of

24      the value of those music rights based on the January 1, 2011

25      ASCAP repertoire, and then a separate calculation of the

D98TPANA

 1    repertoire as it exists that very year.

 2            MR. COHEN:  I think not quite, but conceptually I

 3    think the same -- let me try this way.  Let's assume that the

 4    market implies a value of -- I'm not only talking about ASCAP,

 5    let's say the market implies a value of ten percent or five

 6    percent for music performing rights.  That what I can show that

 7    was paid by services like Pandora in a given year for all of

 8    the music performing rights they get from ASCAP, from BMI, from

 9    SESAC and direct licenses, is five percent.  What I would say

10    is that ASCAP has half the performances on Pandora, they get

11    half of that five percent.  If they only have a quarter of

12    those performances because they have lost a bunch of music,

13    ASCAP lost music as part of the new media withdrawal, it gets

14    half of that 2 percent, it gets 1.25 percent, because its

15    performances on Pandora have gone down and the value to Pandora

16    of the ASCAP license has been diminished by the withdrawal of

17    repertoire.

18            And we may start with a different baseline in each

19    year depending, because the market has been evolving.  Our

20    concept of the fee is that there's a market rate and these

21    withdrawn licenses have created a market for performing rights.

22    And that rate has not been the same each year, so we would say

23    what was the market -- just as one year it may cost $100 a

24    square foot to rent a store, the next year it may cost $200 a

25    square foot.  So first, what's the market price, and then

D98TPANA

what's ASCAP's contribution to the value of music on Pandora?
We're likely -- we're still refining it, the parties haven't
exchanged expert reports yet, but it's coming -- we're likely
to adjust based on performances, so that the rate we will
propose will take into account the new media withdrawals.

        And that's how Mr. Steinthal's client will be able to
figure out what the fee is.  And that's the kind of license
they have entered into.  They have entered direct licenses on
precisely that basis.  The value of music performing rights is
X percent, and you, withdrawn publisher, get your share of that
X percent.  So I think it's exactly their structure, and
therefore when Mr. Steinthal says we must have this decision
before the trial because we won't know how to set a fee, I just
don't think that's true.  Because we are living -- we have
worked very hard to live in a world where this repertoire is
dynamic and they're not paying twice for the same music.

        And the marketplace will dictate -- Pandora's users
will dictate what is the value of the ASCAP repertoire, as
opposed to the BMI repertoire or SESAC repertoire or any other
repertoire based on the number of plays.  And maybe we'll have
a dispute about whether that's the right adjustment metric or
they think it should be some other adjustment metric.  But we
don't need to resolve this question, which has enormous
implications, enormous implications for ASCAP, its members,
ASCAP's competitive position and fundamental decree

D98TPANA

1      interpretation to get to the trial.

2              I'm not suggesting, your Honor, that your Honor

3      disagrees with everything I'm saying, you can't rule, but to

4      the extent Mr. Steinthal says you must rule now because we

5      won't know how to present a fee proposal at trial, I think

6      that's simply not true.  And we can propose a fee at the trial

7      that takes into account the effect of these withdrawals.

8              And if ASCAP winds up with just the dregs -- I hate

9      that word, but it's his word -- but if it's the dregs, it will

10     be paid on the dregs.  Because if the dregs don't get played on

11     Pandora, Pandora is not going to be paid a lot of money to

12     ASCAP in 2014 and 2015.  The market will dictate.  The markets

13     of users will dictate what the value of these compositions are

14     to Pandora, and we'll apply that against the percentage of

15     their revenue only, which is exactly the way they have

16     structured their mutual licenses.

17             So your Honor, I know it's been a long afternoon for

18     your Honor.  I think the fundamental decree point that I wanted

19     to make is that the decree does not say anything that requires

20     members to be all in or all out at ASCAP.  They're allowed to

21     reserve for themselves -- they have been since 1950 allowed to

22     reserve for themselves certain rights that they don't want to

23     grant to ASCAP.  When ASCAP gets the grant that it gets, it's

24     required under the consent decree to make all the works that it

25     has the right to license for those kinds of users to that user.

D98TPANA

But if a member says I don't want you licensing broadcast

television, I want you to license everything else, neither

Section 6 nor Section 9 nor any of the other sections that

Mr. Steinthal relied on requires that property owner to make

ASCAP its licensing agent for all purposes.

THE COURT:  Now before these partial withdrawals that

are at issue here, was there any historical experience with

that kind of conduct by members?

MR. COHEN:  Only with -- no, your Honor, there was

only respect to this question of foreign rights, but with

respect to domestic rights, no.  Because ASCAP, of course, is a

membership organization.  It didn't want to lose its rights.

The members were content to give all those rights to ASCAP, but

there are some examples.  For example, I think in the

advertising world, music on advertising, there are certain

songs where members grant sync rights and performing rights and

works that are otherwise in the ASCAP repertoire, but there's

no withdrawal of this kind, certainly no withdrawal of this

kind.  But that's not a question of the decree, I would say,

your Honor, that is a decision between ASCAP and its members as

set by the ASCAP board.  That's why ASCAP went to its board.

The board actually debated whether it wanted, as a matter of

its own policy, to allow for these partial withdrawals.  That's

a different question than saying the decree affirmatively and

unambiguously requires the grant to be all or nothing.

D98TPANA

1          THE COURT:  Even if I should find the decree

2     unambiguous and rule along the lines that you fear, then

3     ASCAP's recourse -- one recourse, besides getting me reversed,

4     would be to talk to DOJ and to have another amendment to the

5     consent judgment.  Am I right?

6          MR. COHEN:  Yes, of course that's always right.  It

7     took years to get to the last event.  It took years and years

8     of work, both because of the fact, as your Honor has already

9     observed, DOJ is a busy agency that has a lot of things to do.

10    There is a public process to it.

11         So one thing that I'm suggesting again, your Honor, is

12    we should at least hear them out.  I don't know which way

13    they're going to come in.  I'm not suggesting to your Honor

14    asking you to get the DOJ to weigh in with their vote in my

15    pocket.  I don't have it; nor does Mr. Steinthal, I understand.

16         THE COURT:  No, I assume, Mr. Cohen, if you had it, it

17    would be have been in your papers.

18         MR. COHEN:  Absolutely.  And the same for

19    Mr. Steinthal.  Nobody has their vote.  But I think it would be

20    more efficient, given, one, the difficulties of getting your

21    Honor reversed in the Second Circuit, and two, the difficulties

22    of getting a decree amended, which it takes an enormous amount

23    of time, before we rush to judgment on this issue.  Let's hear

24    from DOJ.  Let's understand the full implications of what we're

25    doing, and the only then remaining question is:  Will that

D98TPANA

somehow impede the trial?  And I'm suggesting to your Honor:

No.  They don't need this answer for the trial.

　　　　　THE COURT:  Well, I mean I would hope to have an

answer from DOJ before the trial if we went that route.

　　　　　So what is the question you would put to DOJ?

　　　　　MR. COHEN:  Well, I would put to DOJ the questions

that are posed on summary judgment.  There are a series of

questions.  The question that -- well, let's start with your

questions.  Your Honor has asked a series of questions which I

understand your Honor to say leads you, unambiguous, to the

conclusion that the decree unambiguously precludes the new

media withdrawals.  Obviously when we got your questions, it

was not a cause for celebration on the ASCAP side, and we

appreciate the opportunity to lay out our arguments.

　　　　　I don't think that's the decree that we entered into.

We'll have to see, DOJ may disagree agree with us.  It would

not be the first that the Department of Justice and ASCAP

didn't agree on a question of interpretation.  But I think,

your Honor, at least hypothetically, if ASCAP and the

Department of Justice both say to your Honor that we were the

parties to the decree, we sat around the negotiating table.

Maybe we did a bad job drafting here, but this is not what we

intended.  That may or may not lead your Honor to a different

conclusion, but I think it would be an important piece of

information for your Honor to have with respect to a decree

D98TPANA

1    interpretation which Mr. Steinthal says he only cares about

2    Pandora, but will have unbelievable consequences for ASCAP,

3    particularly because we don't know how the BMI decree will work

4    out.  So BMI has engaged in this same new media withdrawal, and

5    ASCAP can find itself in a position, as soon as your Honor's

6    decision is rendered, if it's rendered now, where ASCAP's

7    members can't withdraw new media rights and BMI members can.

8              THE COURT:  Well, I understand that what ASCAP was

9    facing here was a total withdrawn by BMI.

10             MR. COHEN:  Yes, your Honor.

11             THE COURT:  Or a partial withdrawal, which was the

12   compromise solution.

13             MR. COHEN:  Total withdrawal an enormous blow to

14   ASCAP, particularly if our friends at BMI -- at the moment

15   they're in rate court at a very close stage with Pandora.

16   There's no pending summary judgment motion before them.  And

17   they have, I understand, have effected new media withdrawals,

18   the details of which I'm not conversant with, but my general

19   understanding is it has the same effect.

20             So we could be in a period where, if members want to

21   take out new media rights from ASCAP, they will withdraw from

22   ASCAP and go to BMI because BMI permits new media withdrawals.

23   That would upset the competitive landscape drastically, and I'm

24   suggesting to your Honor that some degree of restraint, given

25   all these ramifications, is worth considering.

D98TPANA

```
 1              THE COURT:  I'm going to have a rate court decision in
 2     December or January, whatever, trial in December.  I have no
 3     idea what the appropriate rate should be.  Nobody has gone to
 4     make submissions to me on that.
 5              MR. COHEN:  Yes, your Honor.
 6              THE COURT:  I don't think anyone could have any basis
 7     to anticipate that the rate will be too high or too low.  I am
 8     tabula rasa on the rate.  So I know December looks like months
 9     away, but it's really fairly close.
10              MR. COHEN:  Painfully aware of that, your Honor, yes.
11              THE COURT:  Let me suggest that the question we would
12     ask DOJ is not what did you intend way back when, because --
13              MR. COHEN:  I understand.
14              THE COURT:  -- its lawyers are perhaps not there any
15     more, and that's perhaps not the appropriate question.  So
16     we're going to take a break now, and I would like counsel to
17     discuss with each other to formulate for yourselves and then
18     discuss with each other if we were going to ask DOJ a question,
19     a single question, hopefully, because I would like them to be
20     able to actually answer this question before December, what is
21     that question?
22              MR. COHEN:  I think it might be question four, but I
23     will be happy to talk to Mr. Steinthal.  Because I think that's
24     the fundamental question.  The rest of it is the road map to
25     get there, but if I'm correct that the decree allows a partial
```

D98TPANA

1     assignment of rights, then I think questions one, two and three

2     have to be rethought.  They would have to explain to your Honor

3     why, of course.  You're the arbiter of the decree, I understand

4     that, I'm not suggesting they're binding, but I would think

5     that would have some impact on your Honor, but I think it's

6     question four.  But I'm happy to speak to Mr. Steinthal now.

7               THE COURT:  We'll take a recess.

8               (Recess taken)

9               THE COURT:  Mr. Steinthal, did you want a right to be

10    heard?

11              MR. STEINTHAL:  Your Honor, we don't have an agreement

12    on a single question to go to Justice.  We each have a question

13    that we drafted, and maybe we should come back to that at the

14    end after I try briefly to respond to some of Mr. Cohen's

15    arguments.

16              First of all, as to the need to reach out to the

17    Justice Department, frankly, the question of ambiguity or not

18    within a decree is a question for the Court.  I think that our

19    submissions, the argument today, the decree itself demonstrably

20    reflects that there's no ambiguity here.  It may be there that

21    are policy issues that ASCAP is troubled about.  That footnote

22    in the Department of Justice memorandum reflects things may

23    change -- may need to change the decree, but right now it's

24    unambiguous, and our motion should be granted as a consequence.

25              We'll come back to what, if anything, we'll request of

D98TPANA

1   Justice, but to be absolutely clear, we don't think it's

2   necessarily.  Clearly Justice has been advised.  Justice knows

3   this is going on.  They obviously felt -- and I think Mr. Cohen

4   suggested that their initial responses was let's see what the

5   judge does, so our view is let's see what the judge does.

6           Now secondarily, even if there is going to be an

7   outreach to Justice, that would cause delay.

8           THE COURT:  No.

9           MR. STEINTHAL:  Well, it would cause a delay between a

10  decision immediately and a decision in December, and I want to

11  talk about why that's so important.  And I want to float the

12  following, which goes back to why at the very beginning I said

13  I know that our arguments have implications beyond our specific

14  motion, but again, all of what Mr. Cohen is complaining about

15  and wanting to go to Justice about relates to interpretations

16  that don't affect our argument that whatever the broader

17  implications, there's no way, if we have on the date of

18  application all these works in the repertoire, you can't

19  eviscerate Section 9.

20          This other stuff about partial withdrawals, that goes

21  to Sections 4 and 6, it really -- there's a separate issue

22  here, and it's an equitable issue and a Section 9 issue.  For

23  this case you can say look, the repertoire was the repertoire

24  at the point in time when we applied, no publisher withdrawals

25  will have affect on the scope of the repertoire that is going

D98TPANA

 1    to go to trial in December.  That gives Justice opportunity to

 2    talk about the broader issue.  Maybe we can frame the broader

 3    issue in a much more relaxed fashion, for lack of a better

 4    word.  But your Honor, you have the capacity in the context of

 5    this specific motion to say look, Article 9 would be

 6    eviscerated if I permitted the repertoire to be diminished

 7    after a licensee legitimately invoked its rights under Article

 8    9.  If we get that ruling from you, your Honor, then we can go

 9    to trial.  And I will explain why it's important we get it

10    beyond this, but we can go to trial and the broader issue

11    doesn't have to slow anything down.

12            Why is it so important?  Mr. Cohen says it's easy, set

13    a rate and whatever the number of performances it is, it is,

14    and it will be a percentage of that.  It's not so simple.

15    Because as I read from the DOJ memo earlier, if we have so

16    little left in that blanket license, then all the aspects of

17    indemnification and access, those values go away, number one.

18            Number two, there's got to be a showing -- there's an

19    evidentiary issue here, your Honor.  Do I not have to get ready

20    for trial thinking that I've got to demonstrate that what is

21    left in the ASCAP repertoire is not representative, and

22    therefore, it's a lesser value?  Hypothetically, suppose -- I'm

23    sure there are a lot of publishers and say my stuff is better

24    than their stuff, and we should get a higher price, if it was

25    just me licensing in the market compared to someone else

D98TPANA

1    licensing in the market.  I think some economist might very

2    well say if the best of the repertoire has been pulled out and

3    they're now getting X plus percent, and the prior rate was X,

4    well maybe what's left should get X minus.  You have to

5    evaluate what's left.  You can't just assume that every work

6    has the same proportionate value.  Mr. Cohen is asking you to

7    determine now that every work has the same proportionate value.

8    I just don't think that's fair to say.  I need to know in

9    advance of trial whether I have got to deal with that.

10          Because if you ultimately allow these withdrawals so

11   that the scope of the license Pandora gets from ASCAP, the

12   limited -- this is just Pandora now, just what my mom told me,

13   I only care about Pandora.  In this particular case, if you

14   tell me the license that I've got to go to trial and prove the

15   value of is just what's left after all the scheduled

16   withdrawals, I've got to now talk to experts about a different

17   way of valuing what's there then if we're talking about the

18   full ASCAP repertoire.  So we have a very important reason for

19   you to rule on this as to the limited circumstances of

20   Pandora's consent decree license.  We need that ruling now so

21   we can get ready for trial.

22          There's another part of this is that is equitable.

23   Think about it from this perspective:  If we don't get a ruling

24   from you, the Sony and EMI licenses are expiring 12/31/12.  The

25   Warner/Chappell withdrawal is effective 1/1/13.  The Cobalt

D98TPANA

1    withdrawal is effective October 1, 2013.  I think I said

2    1/1/13, I meant 1/1/14.

3         The bottom line is, your Honor, if we don't get a

4    ruling from you, we have got to negotiate direct licenses that

5    we don't think we need to have.  Because we think the proper

6    construction, at least of Pandora's circumstances, is that

7    we're entitled to a blanket license with all of the repertoire

8    before any withdrawals occurred after our consent decree

9    license took effect.  So we've got not only proof problems if

10   you don't rule, we've got enormous practical and licensing

11   problems if you don't rule.

12        So I urge the Court that if there's any degree to

13   which you feel you need to wait for some feedback from Justice,

14   that goes to the broader issue.  It doesn't go to the more

15   limited issue of whether, at a minimum, your interpretation of

16   the decree, and not just the definitions of work and repertoire

17   and mandatory licensing under Section 6, but a minimum the

18   Section 9 protections to licensees cannot be subverted.

19        That's why we need a ruling now, combination of we

20   need to get ready for trial, we need to know whether we have to

21   prove that what's left in the repertoire is not representative,

22   and therefore, we want -- we need to prove that the value of

23   what's left is not proportionately equal to that which has been

24   pulled out.  We need to know that.

25        THE COURT:  So in this narrower ruling, the burden

D98TPANA

would then be imposed upon ASCAP to -- if it thought it could

permit partial withdrawals, to make them subject to a licenses

in effect provision so it did not impact entities like Pandora,

that it also already applied for a license to begin before

withdrawal date.

MR. STEINTHAL:  That would be correct, your Honor.  As

we articulated, it would be if our application -- if our

consent decree license was treated as a license in effect, we

wouldn't have this problem.  And that's the way we couched it.

And it struck us that the record reflected that ASCAP was

considering, for example, the RMLC agreement as effectively a

license in effect, as you couldn't otherwise harmonize some of

the language in the letters that we cite in our papers.

But the bottom line is if you look at even ASCAP's own

rules, it doesn't define license in effect other than that it's

an entity that has a license.  So it doesn't talk about

finalizes, interim licenses, consent decree licenses, it talks

about having a license in effect.

As far as I'm concerned, and we put this in our

papers, our ability to perform ASCAP music as a licensee was no

different on January 1st, 2011, than it would be if we were a

final signed blanket licensee.  We couldn't be sued for

infringement.  We had access to the entirety of the ASCAP

repertoire on that date.  Why is that not a license in effect?

I understand their position is well, we -- my view --

D98TPANA

1    arbitrarily decide it's not.  But if you found that we can be

2    treated as effectively having a license in effect, or you

3    found -- and I think you could find this, I think it's true --

4    that to do otherwise violate Article 9, because we would be

5    deprived of our Article 9 right for rate setting as to the

6    entirety of the repertoire.

7         The Article 9 provision is clearly being subverted by

8    ASCAP's provision.  And from that perspective, I don't see how

9    they could even make a whimsical argument, because we have the

10   right to use all those works.  How can it be that -- and think

11   about it this way, what if, your Honor, we go to trial and

12   50 percent of the repertoire is in there, and we get a great

13   recalling for Pandora.  What stops them from saying I'm out of

14   here the next day?  I mean it can't be that they can play this

15   day by day and decide I'll wait and see how ASCAP is doing in

16   the rate court proceedings or not.  There has to be some

17   definitiveness.  We applied for a license.  We were licensed

18   effective 1/1/11 and have a consent decree license for a

19   five-year term.  How can they pull the rug out from under us

20   consistent with Article 9?

21        THE COURT:  But on the other hand, EMI, after the rate

22   court proceeding, if it doesn't like the ruling, could simply

23   withdrawal entirely from ASCAP, take all its works for all

24   purposes, and they would not be covered by the ASCAP license.

25        MR. STEINTHAL:  And you know what, at least we

D98TPANA

1    wouldn't be discriminated against relative to other licensees.

2    We would be on the same footing as everybody else.

3        If they want -- I don't think they want to do that,

4    your Honor.  I don't think they want to do it.  They can do it.

5    I'm not saying they can't.  But there's nothing in the decree

6    right now that permits this notion that our work is in for some

7    licensees and out for others.  And that's the rub.

8        Now how do we do this in a way that has some degree of

9    equity and some protection to the rights of a licensee like

10   Pandora in these circumstances without delaying the trial and

11   without waiting for justice?  It's to do the more limited

12   holding now and keep options open, so to speak, if the Justice

13   Department wants to weigh in and your Honor wants to wait for

14   that.

15       Again, I can't say enough that we don't think you need

16   to wait.  It's a question of ambiguity and unambiguity, and we

17   think it's unambiguous, and that your Honor has the ability to

18   make this ruling now without waiting.  Justice has been made

19   aware, and they obviously didn't think it was important enough

20   to come up here or they had enough to say immediately.

21       THE COURT:  I'm not willing to infer anything from the

22   silence.  They have a lot on their plate, and, if anything, I

23   say I would like a fuller record.

24       MR. STEINTHAL:  So I have addressed, I think, the

25   issue of whether to wait or not and why we can't in order to

D98TPANA

1    avoid the situation that I described.  I'm going to very

2    briefly address some of the, frankly, mostly new arguments made

3    by Mr. Cohen in his presentation.

4         He said there's nothing in the decree that speaks to

5    ASCAP's ability to the license works to some licensees and not

6    other licensees.  I found that to be surprising, because if you

7    look at Section 6, in fact, there is a provision that relates

8    to ASCAP's ability to license works to some licensees and not

9    to other licensees.

10        And I urge your Honor to take a look.  It's the latter

11   portion of Section 6 after the mandatory licensing provisions.

12   It says ASCAP shall not grant to any music user a license to

13   perform one or month specified works in the ASCAP repertoire

14   unless both the music user and member or members in interest

15   shall have requested ASCAP in writing to do so.

16        So there is a provision that would allow a more

17   limited license, so to speak, where some users are licensed and

18   some are not, but it requires the user's consent.  It's not as

19   if the decree is silent on it, there's a provision in the

20   decree that addresses it.

21        Obviously we didn't -- it's not something that I would

22   have cited affirmatively to you in great measure other than the

23   fact that it contradict Mr. Cohen's point that the decree is

24   absolutely silent about the possibility of ASCAP licensing

25   works to some users and not other users.  It's possible, but

D98TPANA

1   that's not what is happening here.  We don't have that consent

2   of Pandora here.

3            THE COURT:  Well, it wouldn't be your consent, it

4   would be, for instance, RLMC, right?

5            MR. STEINTHAL:  But RLMC did not agree, your Honor, to

6   a license to less than all of the ASCAP repertoire.  They did

7   not agree to a license to perform one or more specified works

8   within the repertoire.  They got the whole repertoire.

9            THE COURT:  Right.

10            MR. STEINTHAL:  To the extent ASCAP wants to have the

11   ability to license specified works in the repertoire, it would

12   require the user's consent.  The decree enjoins ASCAP from

13   licensing less than all the repertoire absent Pandora's

14   consent.

15            Now the reference to Alden-Rochelle and the relief

16   there, your Honor, that was an injunction flowing from an

17   antitrust case against ASCAP.  There's no way this injunction

18   is instructive about purported partial withdrawals of subsets

19   of rights or subsets of works.  Those partial withdrawals that

20   are at issue here apply to ASCAP's right to license some users

21   and not other users.  That's not what was involved in

22   Alden-Rochelle.  And here, where ASCAP as not been enjoined

23   from licensing an entire sector based on a prior antitrust

24   suit, there's nothing in the decree that permits ASCAP to the

25   license works on that the basis, and Alden-Rochelle doesn't

D98TPANA

1     help them in any way, shape or form.

2              Mr. Cohen refers to Article 4.  I would alert the

3     Court to footnote 20 in our brief as to Article 4F, which we

4     think to the extent Article 4 is instructive here at all, it

5     favors us and our interpretation, not ASCAP's.  That's the

6     provision which provides that ASCAP may not assert or exercise

7     any right or power to restrict from public performance by any

8     licensee of ASCAP any work in order to exact additional

9     consideration for the performance thereof.

10             And we would argue that's exactly what's happening

11    here where specific subsets of the ASCAP repertoire are being

12    removed as to Pandora and not to other users for the exact

13    purpose of exacting additional consideration.  So, if anything,

14    Article 4 supports us.

15             The '41 decree, your Honor, it can't be used to try to

16    create ambiguity that does not currently exist.  I'm not going

17    to say anything more about that.

18             THE COURT:  Well, I guess I would like you to say

19    something more about it.  I agree with that general point of

20    finding ambiguity, but it's talking about prohibiting -- ASCAP

21    cannot prohibit members from issuing exclusive licenses.

22             So to me, it's not talking about what ASCAP can do or

23    not do with respect to a work within the ASCAP repertoire, it's

24    talking about ASCAP making as a condition of membership or

25    ASCAP conditioning membership on ASCAP's control of how the

D98TPANA

members behave even with respect to perhaps works that aren't

part of the repertoire.  Am I reading this wrong?

          MR. STEINTHAL:  I would agree with your Honor, and I

think it has nothing to do with the issue of the current decree

and ASCAP's obligations to license all the works in the

repertoire as defined in the manners we talked about earlier.

So I don't think it creates an ambiguity, but I also don't

think that -- I don't think you can use it to create an

ambiguity, so it's irrelevant, but even if you went there, I

don't think it helps their position on this issue.

          And just a couple more little points.  There are so

many that were brought up.  But this whole notion of the policy

of the decree to promote direct licensing, your Honor is well

aware of the fact that direct licensing has existed under the

decree previously.  There's no need for these partial

withdrawals in order to protect the rights of publishers to

direct licenses.  So I think that's the easy answer to that

one, and I could develop it more if I had more time.

          And as far as BMI is concerned, I go back to what my

mother said to me, you have only one thing to worry, and that's

the ASCAP consent decree.  What happens with BMI happens with

BMI.  I think it's entirely speculative to think about how

publisher withdrawals are going to impact BMI.  BMI filed a

rate court proceeding against Pandora a few months ago and it

will play out how it plays out.  But that can't be an issue for

D98TPANA

1   your Honor as you try to sort through what the ASCAP decree

2   means and the relief we seek on this motion.

3           So those are my point generally and specifically on

4   the two big issues at the very beginning, and I don't know how

5   you would like to deal with the questions that might be sent

6   the way to the Department of Justice.  We have a different

7   approach to that than ASCAP does, for sure.

8           THE COURT:  What is your approach?

9           MR. STEINTHAL:  Our question would be:  If the Court

10  finds any ambiguity in Articles 6 and 9 of AFJ2, to what would

11  the Department of Justice point the Court to consider in

12  resolving such ambiguity?

13          THE COURT:  OK.  Thank you.

14          MR. COHEN:  Your Honor, may I be heard briefly?  I'm

15  mindful you didn't invite us for dinner, so I will be very,

16  very quick.

17          One of the problems with kind of reading a decree on

18  the fly is that it gets read on the fly.  So Mr. Steinthal's

19  reading of Article 6 is completely wrong.  The first part of

20  Article 6, Section 6, talks about what ASCAP is ordered to do

21  for a music user who seeks the right to perform all of the

22  works in the ASCAP license, in the ASCAP repertoire.  That's

23  what his client asked.  The remainder is what happens when

24  somebody asked for one or more specified works.  So when

25  somebody makes a request for blanket license like Pandora, the

D98TPANA

1    second part of Section 6, Article 6, has no applicability at

2    all, and we can't start reading the decree out of the

3    historical context.

4         With respect to the timing question, I must say, your

5    Honor, I was surprised by Mr. Steinthal's argument.  I will

6    have a completely different case to try if we were to lose

7    summary judgment, and I don't understand how he could have said

8    his case -- his trial preparation depends upon winning summary

9    judgment.  I mean the fact of the matter is the case was filed

10   on November 3rd.  If they thought they could not get to trial

11   in a cohesive way without sorting this issue out, since he says

12   it's an unambiguous question of decree interpretation, he

13   should have filed his motion months and months and months ago.

14   And we'll both have to go to trial and prepare for trial -- and

15   I know he's perfectly capable of preparing for trial --

16   understanding that we won't know the answer to his question.

17   And whether or not he has to value what is left in the ASCAP

18   repertoire or not, if the motion were denied today, that's

19   precisely what he would have to do.

20        So I don't understand the argument that he does not

21   now have time to prepare for trial.  No one could make their

22   trial plan based on an assumption about what the Court would

23   rule on summary judgment.  So he's in exactly the position

24   today that he put himself in when he decided to make a late

25   summary judgment motion, and presumably he has been prepared --

D98TPANA

1    I know he's been preparing for trial, I have seen a lot of

2    Mr. Steinthal at depositions.  He has been preparing for trial,

3    and he does not have the right to demand a rush to judgment so

4    that he could prepare for trial on the assumption that he would

5    win summary judgment.  And your Honor will rule obviously the

6    way your Honor will rule, but I don't think either party has

7    the right to say I prepared for trial on the premise I would

8    win on summary judgment, and now that I don't know, I'm not

9    really going to be able to do it, and I think he can do it.

10          With respect to the narrow versus broad, I think the

11   more that we explore this issue, the issues are clearly

12   interrelated.  I don't think the narrow issue -- we didn't

13   spend a lot of time on this, but we do say clearly in our brief

14   that if we are going to focus on the question of licenses in

15   effect, our position, and think it's quite clear, is there is

16   nothing in the decree, Article 11(b)(2), which is the only

17   reference to licenses in effect in the decree, makes quite

18   clear that it is only in the decree -- (b)(3) rather -- in the

19   event that the BMI decree is amended.

20          So if we look at Section 11(c), it says each provision

21   of Section 11(b), and that includes the licenses in effect

22   provisions, shall only be effective upon entry of an order in

23   the U.S., which hasn't happened.  There's no dispute about

24   that.  So how can we, as a matter of decree interpretation,

25   answer the narrow question, because we can't answer it, because

D98TPANA

1   there is no such thing as licenses in effect?  And I assume

2   that's why the Court posed the broader questions about what's

3   in the ASCAP repertoire and what's not.

4         So I don't understand this distinction between the

5   narrow question and the broad question.  If the narrow question

6   is did they get a license in effect when they applied for a

7   license on January 1, the answer is there is no such thing as

8   license in effect in the current decree.  So I don't see how

9   that helps Mr. Steinthal.  I don't know how that question can

10  be answered in his favor on summary judgment unless your Honor

11  decides it the way that you were inclined to decide it when we

12  came in here today, which is to say I'm looking at the

13  definition of works and licensing works.  So I think we're

14  necessary asking the broader question.

15        Here's a question that we think is helpful for DOJ.

16  It's close to your question four, but we took out the language

17  of assignment.  I will try to do it slowly because we don't

18  have the transcript.  Whether AFJ2 requires an ASCAP member to

19  grant to ASCAP permission to license the public performance

20  right in its works --

21        THE COURT:  No.  Certainly AFJ2 does not regulate

22  members.

23        MR. COHEN:  So that's why you framed it -- then I'm

24  content to rest on question four.  I'm content -- I understand

25  now why you phrased it the way you did.

D98TPANA

          THE COURT:  AFJ2 is simply a regulation of ASCAP.

          MR. COHEN:  I understand your language.  I'm perfectly

content to take question four, and I don't think the kind of

ambiguity question that was asked by Mr. Steinthal goes to the

heart of what we're doing.  I think question four is the heart

of what we're doing, so that would be the question that I think

we would ask.

          Let me say one thing about DOJ.  I will get myself in

trouble by making representations.  They'll speak for

themselves.  They did not say they were content to wait for the

Court.  I will as accurately as possible report what I said in

my conversation, which they are busy, they have a lot of work,

they didn't think they would be in a position in the time

allotted between the time of the entry of your order last

Thursday and today to respond, so they said they would not be

responding.  I asked them to respond.  I asked them to come.

But I don't think it's because they have a view or they're

waiting.  And I think your Honor can ask them and I think they

will respond.  And they told me if they are asked by the Court,

they will do what they need to do.  So I think you can get them

to respond quickly.  I'm hopeful they will respond quickly.

And for all the reasons that we discussed earlier, I think it's

important to get their views.  And this is an important

overarching decree issue for ASCAP that goes just far beyond

Pandora, and we would like to have their views.

D98TPANA

1          MR. STEINTHAL:  Your Honor --

2          THE COURT:  So have you made written submissions to

3     DOJ construing AFJ2 with respect to these issues?

4          MR. COHEN:  No, your Honor, I made no written

5     submissions to DOJ.  We had conversations with them about the

6     licenses in effect issue.  Your Honor, I take that back.  We

7     may -- we were asked to provide to DOJ examples of how we

8     treated licenses in effect historically.  That's a submission

9     that we made.

10          On the questions that you posed in last Thursday's

11     order, I did not make a written submission.  I had a

12     conversation with four or five folks from DOJ, Mr. Reed's

13     section, earlier this week, Monday afternoon, but nothing in

14     writing about the questions that you've posed, nothing in

15     writing with respect to question four.  The only thing they

16     asked us to provide to them, and I'm happy to provide it to

17     court if it's useful, is how has ASCAP treated licenses in

18     effect historically, the difference between final licenses and

19     interim licenses.  And we submitted materials to them to show

20     that ASCAP has historically treated only final licenses as

21     licenses in effect, paid members only on the basis of final

22     licenses, and works that were in the repertoire at the time of

23     withdrawal.  With respect to interim licenses, ASCAP no longer

24     paid the members and left the members to deal with the new

25     association.  I'm happy to provide that to your Honor, but it

D98TPANA

1    doesn't goes to these questions, it goes to the questions of is

2    a license in effect historically the final licenses or interim

3    licenses.

4         THE COURT:  This triggers a completely different

5    question in my mind.  Please indulge me.  I want to make sure

6    that I understand what has happened here.  EMI is a publisher.

7    There are public performance rights that originate with artists

8    and publishers.  There can be contractual arrangements between

9    artists and publishers with respect to works in the

10   collection -- I am speaking slowly here because I want to make

11   sure counsel correct me if I have a misunderstanding -- with

12   respect to licensing fees.

13        I want to make sure that the works that -- and using

14   EMI as an example, that EMI withdrew from the ASCAP repertoire

15   for purposes of collecting licensing fees in new media, removed

16   those works for all rights holders from the ASCAP repertoire.

17   Let us say there was song A, does it remain in the ASCAP

18   repertoire for new media use for use by music user in the new

19   media space when it is a song published by EMI, so any fees

20   collected for the publisher would not come to ASCAP, but ASCAP

21   may collect fees and send them to the composer on the very same

22   work.

23        MR. COHEN:  I'm not sure I precisely understand the

24   question.  There are a couple of observations I would make, and

25   maybe we could parse it out.  One, for some number of these

D98TPANA

works, the composer no longer owns the copyright but has

assigned the copyright to EMI.  There are, as I understand it,

I'm not the world's leading expert on publishing agreements,

but there are publishing agreements between EMI writers, let's

call them, and EMI which either assign or ask EMI to administer

the copyrights on their behalf and to license and collect on

their behalf.  That is certainly true.

        One part that I wasn't sure about was are you asking

whether EMI has withdrawn all of its works from ASCAP for new

media?

        THE COURT:  Well, I understood that was yes.

        MR. COHEN:  It did in stages.  The initial withdrawals

in May of 2011 were with respect to certain catalogs.  So EMI

is not one entity, it has multiple ASCAP catalogs and also BMI

catalogs.  It initially withdrew nine catalogs and subsequently

withdrew the remainder of its catalogs for new media uses, with

the exception of -- it gets complicated -- of so-called

standard services.

        So new media users that are expected to pay

performance fees of $5,000 or less a year -- not Pandora, not

the major ones -- EMI has given back to ASCAP the right to

license those standard services presumably because of the

efficiency of the marketplace and a concern that some of those

small services would go unlicensed, and ASCAP was in a better

position to do it than EMI.

D98TPANA

1          With respect to the non-standard new media services,

2     as I understand it, EMI now has the right to license.  It has

3     entered into a subsequent administration agreement with ASCAP

4     in which because EMI is not ASCAP, EMI is entering into a deal

5     with Pandora and coming back to ASCAP and saying when I get the

6     money from Pandora, ASCAP, you will distribute that money on

7     our behalf, not because they are ASCAP monies, but because you

8     as a distribution entity are well situated to do it.  And

9     there's a contract.  EMI shopped the contract.  It could have

10    gone to somebody else.

11          I'm sorry to make it so complicated, I'm trying to be

12    as accurate as I can be.

13          THE COURT:  No, this solves the big question in my

14    mind of why EMI would set up a back office operation to

15    duplicate what ASCAP does, and it decided not to, it just

16    contracted with ASCAP to do it.

17          MR. COHEN:  And possibly with BMI as well, but I don't

18    know.  I believe that the administration -- I will turn

19    slightly to make sure I'm getting the right thing -- only with

20    respect to ASCAP works.  So yes, it pays a fee now to ASCAP to

21    administer that, although those distributions have not yet

22    occurred, just make it more complicated.  But yes, your Honor,

23    that's my understanding of what occurred.

24          THE COURT:  So putting aside the non-standard music

25    users -- or is it the standard music users?

D98TPANA

1          MR. COHEN:  I think putting aside the standard.

2          THE COURT:  Putting aside the standard music users,

3     when EMI withdrew a catalog for new media purposes, does that

4     mean -- and putting aside this administration agreement, does

5     that mean that ASCAP does not distribute any licensee income to

6     any composer or artist associated with the works in the EMI

7     catalog?

8          MR. COHEN:  With respect to those new media uses, to

9     be hyper accurate, ASCAP does not collect any fees with respect

10    to those performances.  I'm being hyper accurate.  Because of

11    the administration agreement, it may actually wind up doing the

12    distribution, but it's essentially doing what ADP would do if

13    that were a competitor for ASCAP with respect to distribution.

14    There are EMI moneys that EMI has said you have all this

15    information, you can more efficiently distribute the royalties

16    to our writers than we can, but it's our money, it's not

17    ASCAP's money.

18         THE COURT:  Let me approach it this way.  Does EMI

19    control all the public performance rights for all of the

20    artists on the works in the catalogs that were withdrawn?

21         MR. COHEN:  That's a question I can't answer because I

22    would imagine there are contractual arrangements between

23    writers and EMI that may vary from that.  So I would be

24    reluctant to posit an answer.  That is the general state of

25    affairs that the publisher has been asked by the writer to

D98TPANA

1    enter into the right of public performance, but what I don't

2    know is whether there are agreements in which writers restrict

3    EMI in some way from certain kinds of public performance as

4    between the actual writers or composers on the one hand and the

5    publisher on the other.  And two, if they don't restrict it,

6    what I don't know is whether the writer has the right to also

7    license.  So I can't answer that.  That's just a question I

8    can't answer.  And I suspect there's a contractual variation,

9    but I'm at the edge of my knowledge.

10          THE COURT:  Thank you for being responsive.  But you

11   understand the implications are that the work remains in the

12   ASCAP repertoire for certain purposes, even for new media

13   usage, insofar as the artist who is an ASCAP member has a right

14   to that licensee income and has not given over to EMI the right

15   to collect that on his behalf or her behalf.

16          MR. COHEN:  I apologize, your Honor, I'm not sure I

17   understand your point.

18          THE COURT:  That's OK.  Thank you.

19          Mr. Steinthal.

20          MR. STEINTHAL:  Two quick things, your Honor.  First

21   of all, lest there be any confusion, part of the question is

22   whether EMI's withdrawn works are available for licensing

23   through ASCAP for some licensees and not so for others.  The

24   answer is demonstrably yes.  Most new media transmission

25   licensees of either EMI or ASCAP get their new media

D98TPANA

transmission rights from ASCAP.  The broadcasters who were

covered by the RLMC agreement include all of our biggest

competitors in internet radio, and they get their new media

transmission rights, including specifically as to the, quote,

EMI withdrawn works, from ASCAP, not from EMI; so the standard

services and many others, including others that are deemed to

have licenses in effect.  So I wanted that to be crystal clear.

        The other thing I wanted to be crystal clear is this

licenses in effect notion.  Our argument is not in any way,

shape or form that AFJ2 includes any kind of license in effect

requirement.  We're not arguing that AFJ2 requires that we be

treated as having a license in effect.  We appreciate there's

no license in effect requirement at AFJ2.

        Our position as to why you need to grant our motion

from a smaller issue rather than the bigger issue is that to do

otherwise would violate Article 9.  It would viscerate the

Article 9 protection which we unequivocally were entitled to on

the day we applied for a license.

        So just to be crystal clear, it's not rooted in the

notion that there is a license in effect requirement decree,

our position is rooted in the fact that if you don't rule in

our favor on this motion and determine that the scope of the

license that Pandora is entitled to, we will have been deprived

of our Article 9 right.  And that's somewhat smaller than the

broader issue.  I understand that part of the way to get there

D98TPANA

1      may create issues broader than Pandora, but to be very, very

2      clear, the Article 9 issue is unique to someone in Pandora's

3      circumstance, and the hook for you to grant our motion is

4      Article 9, not some license in effect provision of the decree,

5      which we all acknowledge there is no license in effect

6      requirement in the decree.  I want that to be clear.

7              THE COURT:  Before we part, let's just -- I want to

8      reflect on whether or not I want to ask for DOJ to weigh in

9      here.  But if I do, I will decide that quickly.  And right now

10     the question to be posed is question number four on my list,

11     and the issue is what kind of briefing would be of help to DOJ

12     in addressing that.  And I would think that we would put page

13     limits.  There are two ways to go, either simultaneous briefs

14     or a set of three briefs, a principal brief, an opposition

15     brief, and a reply.

16             Mr. Steinthal, do you have a view to which format, and

17     if it is three briefs, who goes first?

18             MR. STEINTHAL:  Well, most importantly is expedition,

19     so I think if we exchange briefs as to what the Justice

20     Department ought to be weighing in on in a prompt schedule, I

21     think that would be the way to go.

22             THE COURT:  Mr. Cohen, do you have a view?

23             MR. COHEN:  Simultaneous brief.  But I'm not sure

24     Mr. Steinthal reflected the question, not whether the Justice

25     Department should be weighing in on, but our view of question

D98TPANA

1    four to assist the Justice Department.  Is that what you want

2    us to brief?

3              THE COURT:  No, the submissions to DOJ on question

4    four should be simultaneous --

5              MR. COHEN:  To DOJ?

6              THE COURT:  -- to DOJ.

7              MR. COHEN:  Yes, I agree with that, your Honor.

8              THE COURT:  And page limits 20 pages apiece?

9              MR. COHEN:  That's fine with us, your Honor.

10             MR. STEINTHAL:  That's fine.

11             THE COURT:  Give me one second.

12             (Pause)

13             THE COURT:  Well, I want to thank counsel very much

14   for this afternoon's presentation.

15             A couple of observations.  One, Mr. Cohen, the text is

16   not your friend here, so I was a little surprised that you

17   didn't want to go to the purpose and context and antitrust

18   impact here.  I am very concerned about unintended

19   consequences.  Whatever ruling I give, I want to be as narrow

20   as possible.  I am comforted to some extent that I have able

21   counsel on both sides here and the ability of certainly ASCAP

22   to engage DOJ, and if it needs a revision to the consent decree

23   to ask for that.  Because I'm very conscious of the fact this

24   is not the first time in the history since 1941 that there's

25   been a technological revolution, and challenges, practical

D98TPANA

1    challenges, a change in the environment.  And I want to be very

2    sensitive to that.  But ultimately I think my job on this

3    question is a very narrow one, it's a textual interpretation

4    issue.  So I want to thank you.  I'll reflect.  If we are going

5    to send a question to DOJ, I will reflect on the question it

6    will be.  If it's different than this question, I will give you

7    a chance to be heard because I want it to be precise and

8    appropriate.  Thanks so much.

9                                   o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25